COMMONWEALTH of Pennsylvania,
Appellee

v.

Gerald Travis BUTERBAUGH,
Appellant.

Superior Court of Pennsylvania.

Argued Aug. 13, 2013.

Filed May 13, 2014.

David J. Foster, Lemoyne, for appellant.

Zachary I. Mills, Assistant District Attorney, Chambersburg, for Commonwealth, appellee.

BEFORE: BENDER, P.J., GANTMAN, J., PANELLA, J., DONOHUE, J., SHOGAN, J., LAZARUS, J., MUNDY, J., OTT, J., and WECHT, J.

OPINION BY PANELLA, J.

Appellant, Gerald Travis Buterbaugh, appeals from the judgment of sentence arising from a conviction of third-degree murder.[1] We granted *en banc* review to determine, among other things, whether an automobile constitutes a deadly weapon for purposes of the deadly weapon sentence enhancement. *See* 204 PA. Code §§ 303.10(a), 303.17b. Because we conclude that it does, and that Appellant's remaining issues do not merit relief, we affirm.

The trial court set forth the relevant facts and procedural history as follows.

This case concerns the murder of Dale Steven Henry, whom [Appellant] struck and killed with his pickup truck on May 31, 2010. The events leading up to Henry's murder begin on the afternoon of May 30. [Appellant] and some friends, including Shane Waters and Nathan Souders[,] were riding four-wheel all-terrain vehicles, or "four-wheeling," at the Waters family farm near Burnt Cabins, in Fulton County. They started at around 5:00 or 6:00 p.m.

By all accounts, [Appellant] was a family man. He had no history of violence, and he had no prior criminal his-

---

1. 18 PA. CONS.STAT.ANN. § 2502(c).

tory to speak of—only a few DUIs and minor offenses.[2] Though [Appellant] had been a heavy drinker in the past, he quit drinking about ten years prior to the incident. On May 30, 2010, however, he was drinking. At trial, [Appellant] said [he] had a "couple of beers," admittedly a bad decision. He told State Police that he drank approximately six beers while four-wheeling that day.

Later that night, [Appellant] suggested to Souders and Waters that they have a drink at the Hillside Tavern, which is on the road between Burnt Cabins and Fannettsburg, on the Franklin County Side of Tuscarora Mountain. They left and drove over the mountain to the bar in [Appellant's] 1986 Ford pickup truck.

The three arrived at the Tavern a little after 1:00 a.m. [on] the morning of May 31, went inside, and ordered a round of drinks. Inside the bar, Souders saw a woman named Jocelyn Gamble he thought he knew and went to talk to her. It is unclear how many people were at the Hillside Tavern. Souders said there were "six or eight[;]" a bystander said, "less than ten."

Also in the bar was Dale Steven Henry, a 32-year-old white male. He had been drinking a good bit and was drunk at the time—his blood alcohol content, drawn at 4:05 a.m. was .18%. Henry had not been using any illegal drugs, his history of drug abuse notwithstanding. Waters, who testified for the defense, said that Henry was belligerent. Another bystander testified that Henry was also talking to Ms. Gamble.

While Souders was conversing with his friend, [Appellant] drank two more beers. Souders talked to another woman, named "Courtney," which apparently

agitated some of the other six to eight people inside. There is some suggestion that Souders was rude to the woman. At any rate, a confrontation between Souders and the other occupants ensued. The agitators "jumped" Souders and hit him in the back of the head with a beer bottle. Because of the ruckus, the bartender ordered everyone to leave the bar. The people inside complied. [Appellant] and Shane Waters were the last two to leave.

[Appellant] was not involved in the altercation inside the bar. He did not strike anyone and no one hit him. [Appellant] was not involved when the fight spilled outside either, and no one stopped him from going to his truck. There is no evidence that Henry attacked or threatened [Appellant]. Neither did anyone hit Shane Waters.

Souders, on the other hand, was struck again by an unknown assailant, once everyone was outside the bar. According to Waters, Henry was one of the people who attacked Souders, but Souders could not identify Henry as an assailant. [Appellant] also did not know whether Henry assaulted Souders. [Appellant] did not stop to assist Souders, but went straight to his truck, got in and started the engine. Shane Waters pulled Souders away from the fracas and they both got into the truck, Souders in the middle, and Waters in the right passenger seat. In the fight, Souders got a black eye, and a small cut and a bruise to the back of his head. According to [Appellant] and Waters, the angry throng began to throw objects at the truck: beer bottles, rocks, and a pool cue. When the police inspected the scene outside the Tavern, however, they recovered only one broken beer bottle,

**2.** This *en banc* Court, like the original panel who heard this case, does not share the trial court's view that "a few DUIs" is "no prior criminal history to speak of."

no rocks, no pool cue sticks, and no other weapons of any kind.

[Appellant] backed his pickup out onto the road. It stalled and he restarted it, and shifted into forward, pointing toward the road going over the mountain. [Appellant] told police that he was angry and that he revved his engine and spun the tires to try to scare the people outside of the bar. [Appellant] hit the gas and sped forward at "a fairly rapid rate of speed" and accelerated as fast as he could toward Henry. At that time, Henry was standing near the white fog line of the road. Henry had nothing in his hands, and he was not making threatening gestures toward the truck. Henry did not make any sudden movements, and he did not jump in front of the truck. [Appellant] testified that it looked like Henry was throwing something at the truck.

Just before impact, Waters exclaimed, "whoa, there's a guy!" [Appellant] hit Henry head-on, on the passenger side of the front of the truck. The Commonwealth's accident reconstruction expert conducted tests and determined that the truck's speed at the time of impact was 17 miles per hour. The expert also concluded that the truck was travelling at its maximum potential speed when it hit Henry. Both the accident reconstruction expert and the forensic pathologist testified that the speed of impact was sufficient to cause death.

[Appellant] did not apply the brakes, and he did not swerve to avoid Henry. Nathan Souders testified that if he were driving, he thought he could have avoided hitting Henry. In his statement to police, Shane Waters said that "[Henry] could have been avoided," though he later attempted to qualify that statement at trial. Waters also admitted [Appellant] could have avoided the colli-

sion if he had applied the brakes instead of accelerating.

For his part, [Appellant] later gave a statement to Trooper Michael Dick and Corporal Paul McMullen at the Pennsylvania State Police Barracks in McConnellsburg:

Q. [Prosecutor] All right. Now, did [Appellant] express any words concerning—to show his anger? Did he describe to you how he felt at the time?

A. [Trooper Michael Dick] He said he was pissed.

Q. And then what did he tell you happened?

A. He said as he's driving, he pulls out onto the road. Now he's angry. He sees someone standing right along the white fog line, and he said he's pissed. He goes, "I'm driving at him. I'm trying to scare him, because I'm trying to push him off the road." Those are his words. "I'm trying to push him off the road." And then he goes, "I may even give a little jerk," and he motions with the steering wheel, a little jerk to the right. He was trying to scare him, he said, and then he struck the victim.

Q. Now, did you specifically ask him whether or not he saw that person on the white fog line?

A. Yes. I asked that question. He said he did see them. In fact, he was trying to scare them.

Q. Now, did Corporal McMullen ask [Appellant] what was going through his mind as he hit that person?

A. Yes, he did.

Q. And what was [Appellant's] response?

A. "Kiss my ass."

[Appellant] sped up the mountain road. He told Souders that he "wanted

to go back and fly through them and get some more." He did not, however, return to the Tavern, because the pickup was being followed. [Appellant] was eventually able to lose the pursuers.

Responding emergency personnel found [Henry] lying face-up on the white fog line of the roadway. He was severely injured. Henry was evacuated by helicopter to Altoona Trauma Center, and he arrived there at 3:56 a.m. on May 31. The treating doctors were of the opinion that Henry's injuries were hopelessly fatal, and they pronounced him dead later on the same day at 2:10 p.m.

The cause of Henry's death was multiple blunt force trauma caused by the collision. The forensic pathologist testified that fatal collision to Henry occurred at a low speed and it is "well-documented that low speed impacts can cause death."

Meanwhile, [Appellant] returned to Jonathan Clark's house to have Souders' injuries attended to. The impact with Henry's body damaged the hood and front radiator grill of the pickup. Afraid that the people from the Tavern were still looking for them, [Appellant] and Waters tried to find a replacement hood for the pickup.

State police canvassed the area, looking for [Appellant] and the pickup truck. Two troopers went to his home, but nobody was there. After contacting [Appellant's] family members, troopers were able to have him voluntarily go to the McConnellsburg Barracks later on the night of May 31. [Appellant] drove his pickup to the Barracks, with a new hood on it. The old, damaged hood was in the bed. After his interview, [Appellant] was not arrested, and State Police continued their investigation. On June 8, 2010, they filed a criminal complaint against [Appellant] charging him with one count of criminal homicide and took him into custody.

[Appellant], represented by Christopher Sheffield, Esq., pleaded not guilty. After a four-day trial, the jury returned a verdict of not guilty on the count of first-degree murder and guilty on the count of third-degree murder.

Due to the gravity of the case and the issues involved, the [trial court] held a special sentencing hearing on June 8, 2011. The [trial court] received statements from the victim's and [Appellant's] friends and family. The [trial court] also received 93 [statements] supporting [Appellant]. [The trial court] determined that the deadly weapon used enhancement applied, and [the trial court] sentenced [Appellant] to 15 to 40 years of incarceration, a standard-range sentence.

Trial Court Opinion, 11/14/11·at 1–8 (original footnotes and citations to the record omitted).

Appellant retained new counsel, David J. Foster, Esq., and filed a timely post-sentence motion. In that motion, Appellant argued that the sentence imposed was manifestly excessive, the evidence was insufficient to sustain the verdict, the verdict was against the weight of the evidence, as well as six additional evidentiary errors. The trial court also granted Appellant's requested leave to file supplemental post-sentence motions to allow additional time to review the trial and sentencing transcripts.

Appellant filed a timely supplemental post-sentence motion raising claims of ineffective assistance of counsel ("IAC") as well as challenges to the jury charge. Seeking to pursue his IAC claims on direct appeal, Appellant filed a Waiver of PCRA Rights to Allow Ineffectiveness Claims on Post–Sentence Motions and Direct Appeal. *See Commonwealth v. Holmes,* —— Pa. ——, 79 A.3d 562, 563–564 (2013) (the trial

court has discretion to allow a defendant to litigate multiple or prolix claims of ineffectiveness on post-trial motions and direct appeal where good cause is shown and the defendant knowingly and expressly waives PCRA review). The trial court held a hearing that addressed both Appellant's original and supplemental postsentence motions. After additional briefing, the trial court denied the motions. Appellant filed a timely notice of appeal, and both Appellant and the trial court complied with Pa.R.A.P. 1925.

On November 5, 2012, a panel of this Court vacated the judgment of sentence and remanded the matter to the trial court for re-sentencing. The Commonwealth subsequently filed an Application for Reconsideration *En Banc*, which we granted.

Appellant raises eight (8) issues for our review:

I. Whether [trial counsel] was ineffective for failing to introduce evidence of the victim's violent and aggressive character through his criminal record and specific instances of conduct?

II. Whether the [trial] court erred in failing to charge the Appellant's jury on causation in any manner with respect to criminal homicide as the defense had requested and whether [trial counsel] was ineffective for failing to object?

III. Whether the [trial] court gave a prejudicial charge on the element of malice by giving and emphasizing specific instances of evidence tending to support a finding of malice while failing to give specific instances of evidence tending to negate the element of malice on the Appellant's part and whether [trial counsel] was ineffective for failing to object?

IV. Whether the [trial] court gave an incomplete, misleading and preju-

dicial instruction on voluntary manslaughter as it related to "circumstances reducing it from murder to manslaughter" and [trial counsel] was ineffective for failing to object?

V. Whether [trial counsel] failed to object to the improper and prejudicial questioning of prosecution witness Nathan Souders and the court erred in refusing to permit the defense to impeach his testimony through the testimony of Keri Clark and to adduce evidence of his injured, inebriated condition through the testimony of Rodney Waters?

VI. Whether [trial counsel] failed to object to the wholesale admission of Appellant's criminal record through the affiant, which record (with one exception) did not involve dishonesty or false statements and all but one of the convictions was more than 10 years old, and thus its admission was irrelevant and highly prejudicial?

VII. Whether the [trial] court erred in applying the deadly weapon enhancement to the Appellant's sentence by finding that the vehicle involved was an "instrumentality[?]"

VIII. Whether the [trial] court abused its discretion and imposed a manifestly excessive sentence by imposing a minimum sentence of 15 years, which includes a deadly weapon enhancement, and a maximum sentence of 40 years, which is the statutory maximum sentence for third-degree murder, in violation of the sentencing code?

Appellant' Brief at 5–6.

We address Appellant's arguments in order, with the exception of the final two

arguments, which we will transpose for ease of disposition. We begin with Appellant's properly preserved six (6) IAC arguments.

Appellant bears the burden of establishing ineffectiveness because the law presumes that counsel provided effective representation. *See Commonwealth v. Faulk*, 21 A.3d 1196, 1200 (Pa.Super.2011). To meet this burden, Appellant must establish by a preponderance of the evidence that "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." [3] *Id.* (citation omitted). Counsel's effectiveness "cannot be evaluated in hindsight but must be examined in light of the circumstances at the time." *Commonwealth v. Hardcastle*, 549 Pa. 450, 701 A.2d 541, 547 (1997). Appellant's failure to establish any of the aforementioned elements is fatal to his ineffectiveness of counsel claim. *See Faulk*, 21 A.3d at 1200.

■ Appellant's defense at trial was homicide by misadventure.[4] He claims the incident was an accident caused by Henry's role as the primary aggressor. Appellant's Brief at 32. Appellant sought to buttress this defense by demonstrating that Henry had a history of violent and aggressive behavior by introducing Henry's criminal record for assault and retaliation against witnesses through the testimony of Trooper Jason Cachara. *See* Reproduced Record[5] ["R.R."] at 111a, 436–437.[6] The Commonwealth objected to the testimony based on the lack of a self-defense claim. *See id.* at 112a, 438. The trial court ruled that Trooper Cachara could not testify as to Henry's criminal record, *see id.* at 119a, 467–468, finding that "Henry's criminal history was irrelevant to Appellant's defense of accident." Trial Court Opinion, 11/14/11 at 15. Appellant maintains trial counsel was ineffective for failing to introduce testimony regarding Henry's criminal record.

Evidence of a person's character is inadmissible to prove that the person acted in conformity with that character or character trait on a particular occasion. *See* Pa.R.E. 404(a). However, in criminal cases, the accused may offer evidence of a

**3.** To state the third element more succinctly, Appellant must demonstrate that counsel's ineffectiveness caused him prejudice. *See Commonwealth v. Douglas*, 537 Pa. 588, 645 A.2d 226, 231 (1994).

**4.** It is also known as the defense of accident and is defined as follows:

> [T]he accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct. "Three elements enter into the defense of excusable homicide by misadventure: [1] The act resulting in death must be a lawful one; [2] [i]t must be done with reasonable care and due regard for the lives and persons of others; and [3] the killing must be accidental and not intentional, or without unlawful intent, or without evil de-
>
> sign or intention on the part of the slayer.... Even though the homicide is unintentional, it is not excusable where it is the result or incident of an unlawful act, such as pointing or presenting a gun, pistol or other firearm at another person in such a manner as to constitute an offense under the laws of the state...."

*Commonwealth v. Hobson*, 484 Pa. 250, 398 A.2d 1364, 1368 (1979) (citations omitted).

**5.** For ease of reference, we refer to the reproduced record. We note that the transcripts are in the certified record.

**6.** Portions of the reproduced record contain multiple pages of testimony on a single page. When this is the case, the Court will also provide a pinpoint citation to the relevant page(s) of testimony.

victim's pertinent character trait. *See* Pa. R.E. 404(a)(2)(B). Generally, character evidence may not by proven by evidence of other crimes, wrongs, or acts, *see* Pa.R.E. 404(b)(1); however, in a criminal case where character evidence of the victim is admissible pursuant to Rule 404(a)(2)(B), the accused may establish the victim's relevant character trait by utilizing specific instances of conduct, including the victim's criminal history. *See* Pa.R.E. 405(b)(2). The Pennsylvania Supreme Court has described this doctrine:

> *[W]here a defendant alleges self-defense,* he may use his deceased victim's criminal record either (1) to corroborate his alleged knowledge of the victim's quarrelsome and violent character to show that the defendant reasonably believed that his life was in danger; or (2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor.

*Commonwealth v. Amos,* 445 Pa. 297, 284 A.2d 748, 751 (1971) (emphasis added).

*Amos* and its progeny support the proposition that the accused may offer character evidence of the victim *only* where self-defense is alleged. *See, e.g., Commonwealth v. Beck,* 485 Pa. 475, 402 A.2d 1371, 1373 (1979); *Commonwealth v. Rivers,* 383 Pa.Super. 409, 557 A.2d 5, 9 (1989); *Commonwealth v. Ignatavich,* 333 Pa.Super. 617, 482 A.2d 1044, 1047 (1984). Since Appellant's defense in this matter was homicide by misadventure, and not self-defense, he may not utilize character evidence of the victim pursuant to *Amos.*

Thus, the trial court properly ruled that Henry's criminal record was irrelevant to Appellant's defense of accidental misadventure. Accordingly, since trial counsel cannot be ineffective for failing to raise a meritless claim, we deny Appellant's first IAC argument. *See Commonwealth v.*

*Pursell,* 508 Pa. 212, 495 A.2d 183, 189 (1985).

■ Next, Appellant maintains the trial court erred by failing to instruct the jury on the first three subdivisions of the Pennsylvania Suggested Standard Criminal Jury Instruction ("Pa.S.S.C.J.I.") for criminal causation ("causation instruction"), § 15.2501C, and that trial counsel was ineffective for failing to contest that omission. Appellant suggests causation was critical to the jury's analysis because Henry's aggressive behavior was an intervening cause of his death sufficient to preclude a finding of third degree murder. *See* Appellant's Brief at 39. Specifically, Appellant alleges Henry approached his truck in a threatening manner. *See id.*

■ The causal connection required to attach criminal responsibility for the death of a victim must be more direct than the tort law concept of proximate cause. *See Commonwealth v. Stafford,* 451 Pa. 95, 301 A.2d 600, 602 (1973). In *Commonwealth v. Nunn,* our Court described the two-part test to determine criminal causation.

> First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. A victim's death cannot be entirely attributable to other factors; rather, there must exist a causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place. Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible.

> As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. Criminal responsibility may be properly assessed against an individual whose conduct was

a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result. The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt.

947 A.2d 756, 760 (Pa.Super.2008) (citations and quotation marks omitted); *see also* 18 Pa. Cons.Stat.Ann. § 303(a).

The first step in the analysis involves a heightened "but for" test which requires Appellant's act to be a direct and substantial factor resulting in the death of Henry. The second step of the analysis concerns the foreseeable consequences of Appellant's actions. Appellant's argument relates to the first step in the causation analysis since he contends that the accident would not have occurred if not for Henry's alleged intervening act. With this understanding, we turn our attention to the relevant causation instruction at issue.

■■ "In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision." *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa.Super.2006) (citation and brackets omitted). "[I]t has long been the rule in this Commonwealth that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." *Commonwealth v. McCloskey*, 441 Pa.Super. 116, 656 A.2d 1369, 1374 (1995) (citation omitted).

The first subdivision of the causation instruction states:

1. The defendant has been charged with [killing] [causing the death of] [name of victim]. To find the defendant guilty of this offense, you must find beyond a reasonable doubt that the defendant's conduct was a direct cause of [his][her] death.

Pa.S.S.C.J.I. § 15.2501C(1), Criminal Homicide—Causation.

This instruction is utilized "whenever there is an issue of whether the defendant's conduct killed the victim, i.e., was the legal cause of the victim's death." Pa. S.S.C.J.I. § 15.2501C, Criminal Homicide—Causation, Advisory Committee Note. This subdivision relates to the first step in the causation analysis because "[a] defendant's actions are the legal cause of death if they are a direct and substantial factor in bringing it about." *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837, 839 (1973) (citations omitted).

Based on the evidence adduced at trial, Appellant caused Henry's death by striking him with his truck. The accident reconstruction expert testified that Appellant accelerated the vehicle to its maximum potential, and that the speed at which it was traveling at the time of impact was sufficient to cause death. *See* R.R. at 71a, 275. The testimony of the forensic pathologist established that the cause of Henry's death was multiple blunt force trauma caused by the collision. *See id.* at 90a–91a, 354–357. There was no contrary evidence introduced to suggest that Henry's death could be attributed to other causes. Therefore, the trial court was not required to instruct the jury with the first subdivision of the causation instruction because there was no issue regarding the legal cause of Henry's death.

The remaining subdivisions of the causation instruction "may be used singly or in combination when the kind of causation problems that they address are present." Pa.S.S.C.J.I. § 15.2501C, Criminal Homi-

cide—Causation, Advisory Committee Note. Appellant challenges the trial court's decision to not charge the jury on the second and third subdivisions of the causation instruction. We begin with the second subdivision, which reads as follows:

2. In order to be a direct cause of a death, a person's conduct must be a direct and substantial factor in bringing about the death. There can be more than one direct cause of a death. A defendant who is a direct cause of a death may be criminally liable even though there are other direct causes.

Pa.S.S.C.J.I. § 15.2501C(2), Criminal Homicide—Causation.

This subdivision also addresses the first step in the causation analysis because it deals with situations where there are multiple direct causes that arguably resulted in death; it also implicates the second step in the analysis, foreseeability, because it has been applied to cases where there was an issue regarding the chain of causation. *See* Pa.S.S.C.J.I. § 15.2501C, Criminal Homicide—Causation, Advisory Committee Note, (citing *Commonwealth v. Skufca*, 222 Pa.Super. 506, 294 A.2d 787 (1972) (defendant's act of locking her children in a room and a subsequent fire that suffocated children were both direct causes of their death sufficient to sustain conviction of involuntary manslaughter); *Commonwealth v. Evans*, 343 Pa.Super. 118, 494 A.2d 383 (1985) (felonious conduct of appellant started an unbroken chain of causation which aggravated victim's heart disease sufficient to sustain conviction of second degree murder); *Commonwealth v. McCloskey*, 835 A.2d 801 (Pa.Super.2003) (appellant's act of furnishing alcohol to minors started the chain of causation that led to the death of three teenagers)).

The trial court did not err in concluding that this instruction is inappropriate to the facts of this case. Appellant claims an intervening act broke the chain of causation that would preclude a finding of third degree murder. Appellant is not claiming that multiple causes led to the death of the victim. Further, he is not claiming that the cause of death was too attenuated from his act of striking Henry with the truck. Accordingly, the trial court was not required to charge the jury with this instruction.

Lastly, we will address the third subdivision of the causation instruction.

3. A defendant is not a direct cause of a death if [the actions of the victim] [the actions of a third person] [the occurrence of another event] [event] plays such an independent, important, and overriding role in bringing about the death, compared with the role of the defendant, that the defendant's conduct does not amount to a direct and substantial factor in bringing about the death.

Pa.S.S.C.J.I. § 15.2501C(3), Criminal Homicide—Causation.

Subdivision 3 most directly addresses Appellant's argument because it encompasses the idea that "an independent intervening cause . . . is antithetical to direct cause." Pa.S.S.C.J.I. § 15.2501C, Criminal Homicide—Causation, Advisory Committee Note. While this subdivision addresses Appellant's argument, the evidence adduced at trial does not support his contention that the trial court erred by failing to utilize this subdivision of the causation instruction.

Appellant's support for this claim is that Henry approached his truck in a threatening manner. He stated it appeared as though Henry was approaching the vehicle with the intention of either hitting the front hood or that he had just thrown

something at the vehicle. *See* R.R. at 147a, 578. When comparing these facts with Appellant's admission that he swerved the truck at Henry to scare him off the road, *see id.* at 33a, 127, we find no error in the trial court's decision to forego subdivision 3 of the causation instruction based on its determination that Henry's actions did not play such an independent, important, and overriding role in bringing about his eventual death.

In sum, we agree with the trial court that, based on the evidence presented at trial, it is clear Appellant's actions were a direct and substantial factor in bringing about Henry's death. Further, there was insufficient evidence to support Appellant's claim of an independent intervening cause. Accordingly, the trial court did not err by omitting the three subdivisions of the causation instruction from the jury charge. Lastly, Appellant's second IAC argument fails because trial counsel cannot be ineffective for failing to raise a meritless claim. *See Pursell, supra.*

Appellant next challenges the propriety of the trial court's jury charge with respect to malice and voluntary manslaughter on the basis that the charges were prejudicial, misleading, and/or incomplete. He further alleges trial counsel was ineffective for failing to object to these alleged errors.

■■■ When conducting a review of jury instructions, it is important we read the charge as a whole to ascertain whether it was fair or prejudicial. *See Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273, 1274 (1990). The trial court is afforded broad discretion in phrasing jury instructions, and may choose its own wording as the long the law is clearly and accurately presented to the jury. *See id.*

■■■ When instructing the jury on the relevant law, the trial court may refer to relevant evidence in its charge, but in do-

ing so, "it must not usurp the power of the jury to be the sole judge of the evidence." *Commonwealth v. Meadows,* 567 Pa. 344, 787 A.2d 312, 318 (2001) (citation omitted). Determining the proper balance between these competing principles varies based on the facts and circumstances of each case, but certain guidelines have been developed to facilitate this inquiry. *See id.*

> [T]he court may not comment on, or give its opinion of, the guilt or innocence of the accused. Nor may it state an opinion as to the credibility of witnesses, nor remove from the jury its responsibility to decide the degree of culpability. However, the court may summarize the evidence and note possible inferences to be drawn from it. In doing so, the court may … express [its] own opinion on the evidence, including the weight and effect to be accorded it and its points of strength and weakness, providing that the statements have a reasonable basis and it is clearly left to the jury to decide the facts, regardless of any opinion expressed by the judge.

*Id.* (citations and internal quotation marks omitted).

■■■ We begin with the malice charge. Appellant contends the trial court's charge prejudiced him "by emphasizing certain factors of the prosecution's evidence tending to prove malice without mentioning those factors tending to negate malice." Appellant's Brief at 41. Set forth below is the portion of the standard third degree murder instruction relating to malice:

> When deciding whether the defendant acted with malice, you should consider all the evidence regarding [his][her] words, conduct and the attending circumstances that may show [his][her] state of mind including [state of mind]. [If you believe that the defendant intentionally used a deadly weapon on a vital part of [name of victim]'s body, you may

regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant acted with malice.]

Pa.S.S.C.J.I. § 15.2502C, Third Degree Murder.

Appellant objects to the following language, indicated in bold, which the trial court used in addition to the standard language:

When deciding whether [Appellant] acted with malice, you should consider all the evidence regarding his words, conduct, and the attending circumstances that may show his state of mind including *evidence that he was thinking "ki[ss] my ass" when he hit Dale Steven Henry with his truck, evidence that immediately after he hit Dale Steven Henry with his truck he said he wanted to go back and fly through them, and I'd like to go back and take out the rest of the guys who were there.*

*The evidence that he attempted to conceal the crime by removing the hood of his truck with a dent in it where Dale Steven Henry was hit by the truck. The evidence that [Appellant] could have avoided hitting Dale Steven Henry with his truck. And the evidence that he used a deadly weapon, in this case a 1986 Ford F–150 pickup truck, by hitting Dale Steven Henry with said truck on vital parts of Dale Steven Henry, specifically his torso and his head.* If you believe that [Appellant] intentionally used a deadly weapon on a vital part of [the victim's] body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the [Appellant] acted with malice.

R.R. at 197a, 778 (emphasis added).

Upon review, we determine that the trial court's charge was proper. The charge informed jurors of the legal principles applicable to the case, and referred to facts properly in evidence. Furthermore, the trial court reiterated and reaffirmed to the jury that they were solely responsible for determining the facts of the case by stating:

I am not, however, the judge of the facts. It's not for me to decide what are the true facts concerning the charges against the defendant. You, the jurors, are the sole judges of the facts. It will be your responsibility to consider the evidence, to find the facts, and then applying the law to the facts, as you find them, to decide whether the defendant has been proven guilty beyond a reasonable doubt.

*Id.* at 198a, 784. Lastly, while Appellant suggests the trial court must mention facts that tend to negate malice, he fails to cite to any proposition of law supporting this contention. We find that the trial court's instruction was not in error due to its recitation of both the relevant law and facts, and as a result, did not prejudice Appellant. Therefore, we deny Appellant's third IAC claim because it does not possess merit. *See Pursell, supra.*

 Turning next to the voluntary manslaughter jury charge, Appellant maintains the charge was incomplete because the trial court omitted the portion of the standard instructions relating to reducing circumstances that negate a finding of malice, and further that trial counsel was ineffective for failing to object to this omission.

 "[A] voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict." *Commonwealth v. Montalvo,* 604 Pa. 386, 986 A.2d 84, 100 (2009) (citations omitted). Third degree murder is a killing done with legal malice, but without the specific intent to kill; voluntary manslaughter is a form of homicide that involves the specific intent to kill, but

contains no legal malice as a result of passion and provocation. *See Commonwealth v. Pitts,* 486 Pa. 212, 404 A.2d 1305, 1308 (1979).

The standard jury instructions for voluntary manslaughter states in part:

1. As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When these circumstances are present, a killing may be voluntary manslaughter, but never murder. This is true when a defendant kills [in heat of passion following serious provocation] [or] [kills under an unreasonable mistaken belief in justifying circumstances].

2. Accordingly, you can find malice and murder only if you are satisfied beyond a reasonable doubt that the defendant was not acting [under a sudden and intense passion resulting from serious provocation by [the victim] [another person whom the defendant was trying to kill when [he][she] negligently or accidently killed the victim]] [or] [under and unreasonable belief that the circumstances were such that, if they existed, would have justified the killing].

Pa.S.S.C.J.I. § 15.2503A, Voluntary Manslaughter—Murder in Issue.

The second subdivision addresses reducing circumstances, and Appellant contends the trial court erred by failing to include it in its charge. The trial court charged the jury as follows:

As my earlier definition of malice indicates, there can be no malice when certain reducing circumstances are present. When these circumstances are present, a killing may be voluntary manslaughter, but never murder. If you do not find the defendant had malice and committed a murder, you may find him guilty of voluntary manslaughter as long as you're satisfied that the following three elements have been proven beyond a reasonable doubt: First, that Dale Steven Henry is dead. Second, that the defendant killed him. Third, that the defendant had the intent to kill.

R.R. at 197a, 779.

From a careful review of the record, we conclude there is a lack of evidence to support a finding of reducing circumstances. Even assuming Henry did approach the truck in a threatening manner and/or threw an object at the truck, this would not justify Appellant's subsequent use of deadly force since this display was excessive under the circumstances. *See Commonwealth v. Cutts,* 281 Pa.Super. 110, 421 A.2d 1172, 1173 (1980) (when confronted with non-deadly force, a defendant's retaliation must not be excessive). A jury could not find that Appellant needed to strike Henry as a means to defend himself or the other occupants in the vehicle. Furthermore, Appellant testified he did not know whether Henry was involved in the assault against Mr. Souders. *See* R.R. at 147a, 578. Lastly, Henry did not verbally threaten or physically assault Appellant. *See id.* at 578–579.

Because the facts do not support a voluntary manslaughter jury charge, we deny Appellant's claim of trial error, as well as his fourth IAC claim. *See Pursell, supra.*

■ In Appellant's fifth IAC claim, he contends trial counsel provided ineffective representation for failing to object to the opinion testimony provided by Souders. Within this claim, he also presents two separate arguments regarding trial court error. We will first address the IAC claim, followed by a discussion of the two claims of trial court error.

As mentioned, Appellant's fifth IAC claim relates to opinion testimony provided by Souders. Souders testified that he

could have avoided Henry if he were driving the truck, *see* R.R. at 80a, 311, that Appellant was angry when he hit him, *see id.* at 80a, 312, and that he thought Appellant hit Henry on purpose. *See id.* at 81a, 316.

Pa.R.E. 701 provides the standard for lay opinion testimony:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701(a)-(c).

Souders' opinions were based on the conclusions he drew from observing Appellant's conduct on the date of the incident. He was in Appellant's pickup, located directly next to him in the middle of the seat, *see* R.R. at 80a, 312, and could see everything transpiring before him. *See id.* at 79a, 310. The conclusions he drew were not based upon specialized knowledge, but instead fell within the realm of common knowledge, experience, and understanding. Such lay opinion testimony is admissible pursuant to Pa.R.E. 701, thus there was no basis for trial counsel to object. Accordingly, we deny Appellant's fifth IAC claim based on his failure to raise a claim with arguable merit. *See Pursell, supra.* We now turn to the two claims of trial court error.

Appellant's first claim relates to a conversation between Souders and Keri Clark ("Clark"). Shortly after the incident, Souders allegedly told Clark that he did not remember what happened. *See* R.R. at 274a. Trial counsel planned to use this testimony to impeach Souders' recollection of the events that evening. *See id.* The trial court ruled that Clark was precluded from testifying "as to any conversation between [Clark] and [Souders] as to what he recalled or his response thereto." R.R. at 119a, 467.[7] Appellant maintains the trial court's ruling "disallowed this relevant testimony to the prejudice of the Appellant and denied him a fair trial." Appellant's Brief at 53.

Appellant fails to suggest why this testimony is not hearsay, or alternatively, meets one of the recognized hearsay exceptions. *See* Appellant's Brief at 53. The Pennsylvania Rules of Appellate Procedure require that each question an appellant raises be supported by discussion and analysis of pertinent authority, and failure to do so constitutes waiver of the claim. *See Giant Food Stores, LLC v. THF Silver Spring Development, L.P.,* 959 A.2d 438, 444 (Pa.Super.2008); *see also* Pa.R.A.P. 2119(a). Since Appellant has failed to set out a relevant discussion on this issue "[t]his Court will not act as counsel and will not develop arguments on behalf of [Appellant]." *Irwin Union Nat'l Bank and Trust Co. v. Famous,* 4 A.3d 1099, 1103 (Pa.Super.2010). Accordingly, this claim must fail.

Lastly, Appellant maintains the trial court erred by precluding the testimony of Rodney Waters regarding the injured and inebriated condition of Souders on the night of the incident. Once again, Appellant fails to set forth a discussion and analysis of this issue, *see* Appellant's Brief at 53, resulting in a waiver of the claim.

---

7. While not permitted to testify to the content of the statements Souders made, Clark did testify regarding her impressions of Souders on that night by stating he was very drunk, very out of it, to the point where he did not know where he was. *See* R.R. at 162a, 641.

Appellant's final IAC claim involves the introduction of his criminal record through the testimony of Trooper Jason Cachara. Appellant's prior convictions are as follows: (1) disorderly conduct from 1991, (2) unauthorized use of a motor vehicle from 1991, (3) summary harassment from 1992, (4) a DUI from 1996, and (5) a DUI from 2001. Appellant maintains trial counsel was ineffective for failing to object to the introduction of these convictions because all but one of the convictions did not involve *crimen falsi* convictions and because nearly all of the convictions were more than ten (10) years old.

Generally, evidence of an individual's character or character trait, which includes prior criminal convictions, is inadmissible to prove that an individual acted in conformance with that character trait on a particular occasion. *See* Pa.R.E. 404(a)(1). However, such evidence is admissible in two [8] circumstances: as *crimen falsi* evidence or as rebuttal evidence of good character.

Generally, certain crimes involving dishonesty or false statement, whether the result of a guilty verdict, plea, or nolo contendere, may be admitted for the purpose of attacking the credibility of a witness. *See* Pa.R.E. 609(a). Our law recognizes that unauthorized use of a motor vehicle is a *crimen falsi* crime. *See Commonwealth v. Johnson*, 340 Pa.Super. 26, 489 A.2d 821, 824 (1985). However, as in this case, when the conviction is more than ten (10) years old, it is admissible only after a determination by the trial court that the probative value of the conviction substantially outweighs its prejudicial effect. *See* Pa.R.E. 609(b). Consequently,

this claim has arguable merit since it occurred more than ten (10) years ago, and thus may have been deemed inadmissible by the trial court. Before addressing whether trial counsel had a reasonable basis in pursuing this strategy, we will first discuss the remaining convictions.

The remaining convictions were used by the Commonwealth as rebuttal evidence of good character. When the accused offers evidence of a pertinent character trait that is admitted, it opens the door and allows the Commonwealth to rebut the evidence relating to defendant's character trait. *See* Pa.R.E. 404(a)(2)(A); 42 Pa. Cons.Stat. Ann. § 5918.

Throughout the trial, Appellant presented evidence, through his own testimony and the testimony of others, that he has a good reputation in the community and that he was a peaceful, law-abiding person. Accordingly, this opened the door and allowed the Commonwealth to rebut Appellant's claims. In doing so, however, the Commonwealth was not entitled to impeach Appellant's character by admitting his criminal history through a non-character witness on rebuttal. Instead, the Commonwealth should have either cross-examined Appellant's character witnesses regarding the prior convictions, *see* Pa. R.E. 405(a)(1), or impeached Appellant with the prior convictions during cross-examination. *See* 42 Pa. Cons.Stat.Ann. § 5918(1). Accordingly, this claim also has arguable merit. We must next determine if trial counsel possessed a reasonable basis for his actions with respect to all of the prior criminal convictions.

"In determining whether counsel's action was reasonable, we do not question

---

**8.** There is a third exception that permits prior criminal convictions to be admitted when offered to prove some other relevant fact such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* Pa.R.E. 404(b)(2). We will not discuss this exception since it is not argued that any of Appellant's prior criminal convictions meets this exception.

whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had *any* reasonable basis." *Commonwealth v. Washington,* 592 Pa. 698, 927 A.2d 586, 594 (2007) (citations omitted) (emphasis added).

With this in mind, we find that trial counsel had a reasonable belief that the evidence supporting Appellant's good character outweighed the *crimen falsi* and rebuttal evidence. He described this belief as follows.

> And so I think that opens the door to bad character evidence being able to come in in regards to our good character evidence. But, frankly, the tactical reasoning the good character evidence and still today I believe far far outweighed whatever 20 year old summary offenses there were.

> * * *

> My opinion would be that when we put on the type of good character evidence that we did, that other bad character evidence can come in, and if that's possible, then it can come in, then I certainly would think it would be possible that it would come in, and it is far better for the defense to be out in front of those issues so that we don't look like we're hiding those things from the jury.

R.R. at 281a–282a.

Trial counsel's reference to the strength of Appellant's good character evidence is significant. "Evidence of good character is substantive, not mere makeweight evidence, and may, in and of itself, create a reasonable doubt of guilt and, thus, require a verdict of not guilty." *Commonwealth v. Harris,* 785 A.2d 998, 1000 (Pa.Super.2001) (citation omitted). Evidence relating to a defendant's good character is so important that failure to present available character witnesses may

constitute ineffective assistance of counsel if there is no reasonable basis for such failure. *See Commonwealth v. Mickens,* 409 Pa.Super. 266, 597 A.2d 1196, 1203 (1991).

Accordingly, in an attempt to bolster Appellant's defense that the incident was an accident, trial counsel had to establish that Appellant would never intentionally harm anyone due to his good character and respect for the law. In doing so, trial counsel understood that pursuing this strategy would likely expose Appellant to the aforementioned convictions. However, he reasonably believed the negative effect those convictions presented was mitigated since the convictions were not close in time to the current incident, and because some of the offenses were summary offenses. Most importantly, he reasonably believed that Appellant's own positive character evidence outweighed the rebuttal evidence.

With this strategy in mind, trial counsel attempted to inoculate the stigma attached to the D.U.I. convictions by mentioning them in the opening statement and in Appellant's case in chief. *See* R.R. at 10a, 34–35. Trial counsel stressed in his cross-examination of Trooper Cachara that a majority of Appellant's criminal history occurred prior to his 23rd birthday, over 19 years ago. *See id.* at 168a, 664. In addition, during this cross-examination, trial counsel was successful in having Trooper Cachara characterize Appellant's summary convictions as "similar to a speeding ticket as far as severity, but it's just on the criminal side of the crimes code." *Id.* at 168a, 665. In addition, while the form by which the rebuttal evidence was introduced was objectionable, it does not change the fact that the Commonwealth could still have utilized that evidence by cross-examining Appellant's character witnesses or Appellant himself.

■ We also agree with the trial court that Appellant has failed to demonstrate prejudice. *See* Trial Court Opinion, 11/24/11 at 36. All of the convictions were potentially admissible. With respect to the non-*crimen falsi* convictions, it was only the form by which they were admitted that was objectionable.

Lastly, the trial court stressed to the jury that these convictions could only be used for a limited purpose by stating:

> Ladies and gentlemen, you've heard evidence tending to prove that the defendant was guilty of other offenses for which he is not on trial. I'm speaking of testimony to the effect that the defendant has prior convictions, including a misdemeanor of the second degree conviction for unauthorized use of an automobile in the early 1990's, conviction for misdemeanor driving under the influence in 1996, conviction for misdemeanor driving under the influence in 2001, and conviction in May of 1991 for the summary offense charges of disorderly conduct and harassment, and a conviction on September 28, 1992 for a summary offense of harassment.
>
> Now, this evidence is before you for a limited purpose. And that is for the purpose of tending to rebut testimony provided by the defendant's witnesses. This evidence must not be considered by you in any other than for the purpose I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might apply to him for guilt.

R.R. at 192a, 759.

Accordingly, because trial counsel had a reasonable basis in pursuing the aforementioned strategy and because Appellant failed to demonstrate prejudice, we deny his final IAC claim.

Appellant's remaining two arguments are challenges to his sentence. First, Appellant maintains the sentencing court abused its discretion by focusing solely on the severity of the conviction and retributive aspect of the punishment, and by failing to consider Appellant's rehabilitative needs, his potential for redemption, and other mitigating factors. *See* Appellant's Brief at 63–64. In other words, Appellant is raising a challenge to the discretionary aspects of sentencing.

■ We begin by addressing out standard of review in sentencing matters:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch,* 936 A.2d 515, 517–18 (Pa.Super.2007) (citation omitted).

■ The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal. *See Hoch,* 936 A.2d at 518 (citation omitted). An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence.

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the

sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Moury,* 992 A.2d 162, 170 (Pa.Super.2010) (citations omitted).

■ Appellant fulfilled the first two elements by filing a timely notice of appeal, and by preserving his claim in a motion for modification of sentence. Appellant also met the third element because his brief contains the necessary concise statement of the reasons relied upon for appeal. Therefore, we must determine if Appellant's challenge to the discretionary aspect of his sentence raises a "substantial question."

■ Whether a particular challenge to a sentence amounts to a substantial question is determined on a case-by-case basis. *See Commonwealth v. Coulverson,* 34 A.3d 135, 142 (Pa.Super.2011) (citation omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Glass,* 50 A.3d 720, 727 (Pa.Super.2012) (citations and internal quotation marks omitted).

"[A]rguments that the sentencing court failed to consider the factors proffered in 42 Pa.C.S. § 9721 does present a substantial question whereas a statement that the court failed to consider facts of record, though necessarily encompassing the factors of § 9721, has been rejected." *Commonwealth v. Dodge,* 77 A.3d 1263, 1272 n. 8 (Pa.Super.2013).

While Appellant frames his argument, in part, by stating the sentencing court failed to consider certain statutory factors, in substance Appellant merely asserts the court failed to consider mitigating facts of record. Therefore, we deny his claim since it fails to raise a substantial question.

■ Appellant's final argument is that the trial court abused its discretion by applying the deadly weapon enhancement ("DWE") to his sentence. Specifically, Appellant maintains that the vehicle he was driving on the night of the incident does not qualify as an "instrumentality" pursuant to the DWE. This Court has found that application of the DWE presents a substantial question for review. *See Commonwealth v. Pennington,* 751 A.2d 212, 215–216 (Pa.Super.2000). Therefore, we proceed to the merits of this issue.

Our function in interpreting a statute is to ascertain and effectuate the intent of the General Assembly. *See* 1 PA. CONS. STAT.ANN. § 1921(a). The DWE, as part of the Pennsylvania Sentencing Guidelines adopted by the Pennsylvania Sentencing Commission, present a unique question of interpretation that was succinctly described by our Supreme Court in *Commonwealth v. Hackenberger:*

> Although the Sentencing Commission ("the Commission"), rather than the General Assembly itself, directly adopts the Sentencing Guidelines ("the Guidelines") and thus they are not statutes *per se,* the Guidelines nevertheless retain a legislative character, as the General Assembly may reject them in their entirety prior to their taking effect, subject, of course, to gubernatorial review. Moreover, the General Assembly itself has designated the Commission as a legislative agency.

575 Pa. 197, 836 A.2d 2, 4 n. 9 (2003) (citations omitted). Thus, the dictates of the Statutory Construction Act are applicable to our analysis based on the quasi-legislative character of the DWE.

The Statutory Construction Act commands, "[w]hen the words of a statute are clear and free from ambiguity, the letter of

it is not to be disregarded under the pretext of pursuing its spirit." 1 PA. CONS. STAT.ANN. § 1921(b). It is only when the words of a statute are not explicit that a court may rely on established rules of statutory construction. *See* 1 PA. CONS. STAT.ANN. § 1921(c).

Penal provisions of a statute must be strictly construed. *See* 1 PA. CONS.STAT. ANN. § 1928(b)(1). Such a directive does not compel us to attribute the narrowest possible meaning to the words, nor does it require us to disregard legislative intent; instead, it means that if we determine the language of a penal statute is ambiguous, this language will be interpreted in the light most favorable to the accused. *See Commonwealth v. Booth*, 564 Pa. 228, 766 A.2d 843, 846 (2001).

The deadly weapon enhancement provides, in part:

When the court determines that the offender used a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Used Matrix (§ 303.17(b)). An offender has used a deadly weapon if any of the following were employed by the offender in a way that threatened or injured another individual:

(i) Any firearm, (as defined in 42 Pa. C.S. § 9712) whether loaded or unloaded, or

(ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or

(iii) Any device, implement, or instrumentality capable of producing death or serious bodily injury.

204 PA. Code § 303.10(a)(2)(i)-(iii).

The trial court determined that Appellant's truck was a deadly weapon for purposes of the DWE. In reaching this conclusion, it dismissed Appellant's argument that an automobile was not a deadly weapon pursuant to the holding of *Common-wealth v. Burns*, 390 Pa.Super. 426, 568 A.2d 974 (1990).

Burns was convicted of multiple offenses arising out of an hour-long chase he led police officers on while driving a tractor-trailer. One of Burns' convictions was aggravated assault, for which the trial court sentenced him to three to six years. Included in that sentence was the DWE of one to two years because the trial court concluded the tractor-trailer he operated was a deadly weapon. Burns appealed, and our Court held that the General Assembly did not intend motor vehicles to be deadly weapons for purposes of the DWE. In support of this conclusion, this Court stated:

A motor vehicle can be a deadly instrumentality but the General Assembly has enacted specific legislation to deal with the driver of a motor vehicle when the vehicle has caused a death or serious injury. See 75 Pa.C.S.A. § 3732 (Homicide by Vehicle), 75 Pa.C.S.A § 3735 (Homicide by Vehicle While Driving Under the Influence) and 75 Pa.C.S.A. § 3742 (Accidents involving Death or Personal Injury). Because the General Assembly has chosen to deal with motor vehicles in this manner and because we must construe the provisions of a penal statute strictly (1 Pa.C.S.A. § 1928(b)(1)), we hold that the General Assembly did not intend motor vehicles to be considered weapons for the purposes of the deadly weapon enhancement.

*Burns*, 568 A.2d at 977.

Thus, the *Burns* court initially determined, albeit in a conclusory fashion, that a motor vehicle can be a deadly weapon. At this point, the analysis was complete pursuant to the Statutory Construction Act since there was no ambiguity in the DWE. Instead, the Court continued its discussion by referencing various offenses

within the Crimes Code that involve motor vehicles, to stand for the proposition that since the legislature criminalized these acts, it did not intend for motor vehicles to fall within the penumbra of the DWE.

Now that we have had an opportunity to revisit this discussion as a main issue before us, we cannot disregard the explicit directives of the Statutory Construction Act by ignoring the plain meaning of the DWE. The *Burns* Court did not cite the plain meaning provision from the Act in its discussion.[9] Accordingly, we must revisit this issue based on the lack of an initial plain meaning analysis of the DWE in *Burns*.

The plain language of the DWE in Section 303.10 applies to any offense for which a deadly weapon was possessed or used. 204 PA. Code § 303.10(a)(4). Section 303.10 specifically excludes those offenses for which a deadly weapons is an element of the crime, and lists the excluded offenses in Section 303.10(a)(3). *See Hackenberger*, 836 A.2d at 4–5 (stating that the perceived purpose underlying the DWE is immaterial when, pursuant to the plain language of the provision, the defendant utilized a deadly weapon to commit the crime and said crime was not set forth as one of the excluded offenses). None of the excluded offenses is an offense involving automobiles.

The Pennsylvania Commission on Sentencing promulgated the Sentencing Guidelines to assist the courts in imposing sentences. *See Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957, 961 n. 3 (2007). "The guidelines were designed to bring greater rationality and consistency to sentences and to eliminate unwarranted disparity in sentencing." *Id.* (citation omitted).

The DWE provision of the Sentencing Guidelines provides that when the court determines that the defendant possessed a deadly weapon during the commission of a criminal offense, the court must add at least 12 months and up to 24 months to the guideline sentence that would otherwise have been applicable. *See* 204 PA. Code §§ 303.10(a), 303.17b.

For our purposes, an automobile is clearly not a firearm, nor is it one of the dangerous weapons defined in 18 PA.CONS. STAT.ANN. § 913. *See* 204 PA. Code § 303.10(a)(2)(i),(ii). Therefore, our analysis will focus on determining the meaning and scope of the terms "device, implement, or instrumentality" set forth in Section 303.10(a)(2)(iii).

The Sentencing Guidelines do not define the terms "device, implement, or instrumentality." Only one of those terms, "instrumentality," has been defined by our Court for purposes of the DWE. Our Court, quoting Black's Law Dictionary, determined an instrumentality is a "thing used to achieve an end or purpose." *Commonwealth v. Raybuck*, 915 A.2d 125, 129 (Pa.Super.2006). (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)).

Without statutory or decisional authority defining the terms defining the terms "device" or "implement," we thus turn to the dictionary meanings of these words.

Merriam–Webster defines a "device" as "an object, machine, or piece of equipment that has been made for some special purpose." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/device (last visited March 4, 2014). "Implement" is defined as "an object used to do work." MERRIAM-WEBSTER, http://www.merriam-

---

**9.** Curiously, the only provision from the Statutory Construction Act cited by the Court in *Burns* is the directive to construe a penal statute strictly. However, this directive only applies if it is first determined that the relevant provision is ambiguous.

webster.com/dictionary/implement (last visited March 4, 2014). These two definitions appear to limit the scope of a deadly weapon as something *specifically* designed to achieve an end result, which in this case is to cause death or serious bodily injury. However, the Sentencing Commission's use of the word "capable" in the qualifying phrase "capable of producing death or serious bodily injury" expands the scope of such an interpretation.

"Capable" is defined as "able to do something[,] having the qualities or abilities that are needed to do something." MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/capable (last visited March 4, 2014). Utilization of this word promotes the idea that the device, implement, or instrumentality need not originally be designed to produce death or serious bodily injury. Instead, it may be utilized in a different manner to achieve a more nefarious result. From a review of these definitions, we discern that collectively, a "device, implement, or instrumentality" is an object, whether simple or complex, that is *utilized* in a fashion to produce death or serious bodily injury, which need not be consistent with the original purpose of the object.

Our case law supports such an interpretation by stating that, for purposes of the DWE, "[i]tems not normally classified as deadly weapons can become so based upon their use under particular circumstances." *Commonwealth v. Rhoades,* 8 A.3d 912, 917 (Pa.Super.2010) (intact glass bottle qualified as a deadly weapon). We found many examples in our cases: *Commonwealth v. Raybuck,* 915 A.2d 125 (Pa.Super.2006) (commercial mouse poison is an "instrumentality" for purposes of the DWE); *Commonwealth v. Scullin,* 414 Pa.Super. 442, 607 A.2d 750 (1992) (tire iron thrown at victim was a deadly weapon); *Commonwealth v. Cornish,* 403 Pa.Super. 492, 589 A.2d 718, 721 (1991) (fireplace poker used to strike victim constitutes a deadly weapon); *Commonwealth v. Brown,* 402 Pa.Super. 369, 587 A.2d 6, 7 (1991) (saw used to stab victim was a deadly weapon); *Commonwealth v. Chapman,* 365 Pa.Super. 10, 528 A.2d 990 (1987) (straightedge razor placed at the face of an individual is a deadly weapon). With this definition in mind, we must next determine if an automobile is a deadly weapon pursuant to the DWE.

Automobiles are four-wheeled vehicles "designed for passenger transportation...." *See* MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/automobile (last visited March 4, 2014). An automobile is not specifically designed to cause death or serious bodily injury; it is designed for passenger transportation. However, like many of the objects previously mentioned, the character of an automobile changes based on the particular circumstances surrounding its use.

In this case, Appellant's vehicle was originally used for its intended purpose: to transport two friends and himself to a bar. However, the character of the vehicle changed to a deadly weapon the instant Appellant backed his vehicle out of the bar's parking lot, accelerated forward at its maximum rate of acceleration, and struck the victim with sufficient force to cause death. To conclude otherwise would result in the untenable position that an automobile is different than a litany of other everyday objects, which when used with a wicked purpose, can cause serious bodily injury or death.

Assuming *arguendo* that the terms "device, implement, or instrumentality" are ambiguous, we need only look to the Pennsylvania Crimes Code for guidance. The Crimes Code provides an almost verbatim definition of deadly weapon as the one set forth in the Sentencing Guidelines:

Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

18 PA. CONS.STAT.ANN. § 2301.

Our Court has consistently held that a motor vehicle falls within the scope of a deadly weapon as defined by the Crimes Code. *See, e.g., Commonwealth v. Packard,* 767 A.2d 1068, 1071 (Pa.Super.2001) (concluding that defendant's action in driving across a median, aiming vehicle at a pedestrian, and striking the pedestrian was likely to cause serious bodily injury necessary to allow a jury to determine defendant used the vehicle as a deadly weapon); *Commonwealth v. Thomas,* 440 Pa.Super. 564, 656 A.2d 514, 518–519 (1995) (determining that defendant's actions in attempting to make a U-turn, jumping a four-inch-high curb, crashing through a wrought-iron fence, and running into a swing set were sufficient to find that defendant used the vehicle as a deadly weapon).

Therefore, we hold that a motor vehicle is a deadly weapon for purposes of the DWE.[10]

For the aforementioned reasons, we affirm the trial court's judgment of sentence and dismiss Appellant's ineffective assistance of counsel claims in their entirety.

GANTMAN, J., concurs in the result.

WECHT, J., concurs in the result.

**10.** While not raised by either party, we find it necessary to discuss our finding that Appellant's truck is a deadly weapon in light of the United States Supreme Court's decisions in *Alleyne v. United States,* —— U.S. ——, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In both cases, the Supreme Court determined that certain sentencing factors were considered elements of the underlying crime, and thus, to comply with the dictates of the Sixth Amendment, must be submitted to the jury and proven beyond a reasonable doubt instead being determined by the sentencing judge. However, this inquiry is not relevant to our case because of the nature of the DWE.

*Alleyne* and *Apprendi* dealt with factors that either increased the mandatory minimum sentence or increased the prescribed sentencing range beyond the statutory maximum, respectively. Our case does not involve either situation; instead, we are dealing with a sentencing enhancement. If the enhancement applies, the sentencing court is required to raise the standard guideline range; however, the court retains the discretion to sentence outside the guideline range. Therefore, neither of the situations addressed in *Alleyne* and *Apprendi* are implicated.