J-S09035-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROGER MITCHELL RIERA | |
| Appellant | No. 556 MDA 2013 |

Appeal from the Judgment of Sentence dated November 27, 2012
In the Court of Common Pleas of Lycoming County
Criminal Division at No: CP-41-CR-0001459-2011

BEFORE: MUNDY, J., OLSON, J., and STABILE, J. **FILED AUGUST 25, 2014**

CONCURRING AND DISSENTING MEMORANDUM BY MUNDY, J.:

I agree with and join the Majority's resolution of the issues concerning the sufficiency of the evidence, the weight of the evidence, the admissibility of the cell phone video, the testimony regarding the victim's propensity to carry a knife, the propriety of the jury charge concerning involuntary manslaughter, the discretionary aspects of Appellant's sentence, and the alleged discovery violations. However, I cannot agree that the trial court correctly denied Appellant's request for a self-defense instruction based on the recently enacted "Stand Your Ground" law. In my view, Appellant presented sufficient evidence to warrant the instruction. Consequently, I respectfully dissent from the Majority's decision to affirm the judgment of sentence.

As the Majority correctly notes, we traditionally review a trial court's jury instructions for an abuse of discretion.

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision. [I]t has long been the rule in this Commonwealth that a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial.

***Commonwealth v. Buterbaugh***, 91 A.3d 1247, 1257 (Pa. Super. 2014) (*en banc*) (internal quotation marks and citations omitted). "Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error." ***Commonwealth v. Antidormi***, 84 A.3d 736, 754 (Pa. Super. 2014) (citation omitted), *appeal denied*, --- A.3d ---, 126 MAL 2014 (Pa. 2014).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." ***Holmes v. South Carolina***, 547 U.S. 319, 324 (2006) (internal quotation marks and citations omitted). To this end, our Supreme Court has held "[w]here a defendant requests a jury instruction on a defense, the trial court may not refuse to instruct the jury regarding the defense if it is supported by evidence in the record, … [rather] it is for the trier of fact to pass upon that evidence and improper for the trial judge to exclude such consideration by refusing the

charge." ***Commonwealth v. Markman***, 916 A.2d 586, 607 (Pa. 2007) (internal quotation marks and citation omitted). "Although the defendant has no burden to prove a claim of self-defense, before such a defense is properly in issue, there must be some evidence, **from whatever source**, to justify such a finding."[1] ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 n.13 (Pa. 2012) (internal quotation marks omitted; emphasis added). "Once the question is properly raised, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." ***Id.***, *quoting* ***Commonwealth v. Black***, 376 A.2d 627, 630 (Pa. 1977).

On June 28, 2011, the General Assembly amended the self-defense statute to add several new subsections. Included among these changes was 18 Pa.C.S.A. § 505(b)(2.3), colloquially known as a "Stand Your Ground" provision. The effect of this addition was to negate the common law duty to retreat in certain circumstances. The Stand Your Ground provision reads as follows.

**§ 505. Use of force in self-protection**

---

[1] Our Supreme Court has rejected the argument that we view this issue in the light most favorable to the Commonwealth. ***See Markman***, ***supra*** at 607 n.17 (stating, "[w]hile that standard is appropriate to a sufficiency analysis relative to the murder conviction … it is inappropriate to the present inquiry, which focuses on whether there was enough evidence for a reasonable jury to find in Appellant's favor as to the asserted defense[]").

**(a) Use of force justifiable for protection of the person.--**The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.**--

…

(2.3) An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:

(i) the actor has a right to be in the place where he was attacked;

(ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and

(iii) the person against whom the force is used displays or otherwise uses:

(A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or

(B) any other weapon readily or apparently capable of lethal use.

…

(3) Except as otherwise required by this subsection, a person employing protective

force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do or abstaining from any lawful action.

…

18 Pa.C.S.A. § 505.[2]

In the case *sub judice*, Appellant testified at trial to the following.

Q:   [Appellant], when you said that [the victim] said f[**]k him I'm going to kill him, who was he talking about?

A:   He was talking to me.

…

Q:   Were you able or -- what happened when you left?  Or I'm assuming did you leave?

A:   Yes.

…

Q:   Where did you go?

A:   Well, I walked down the road and [the victim] was still being restrained and he just -- he couldn't be reasoned with.  He wasn't able to be calmed down so I was continuing to walk.  The whole time I was walking away I was still trying to reason with him, telling him come on just call me in the morning.  Then after it just [] wouldn't happen.  He's still screaming the same thing over and over.  I'm going

_____

[2] These amendments became effective on August 29, 2011.  The shooting in this case took place on September 18, 2011, so Appellant was statutorily eligible to raise this defense.

to f[**]king kill you[.] I know where you live. I just turned around and realized there is no calming him down. They're still going to hold him so I jogged, caught back up to my group …. And I thought nothing of it and then moments later I here [sic] these footsteps. I turned around and there is this guy screaming he's going to kill me and running after me. That's when I tell him to stop and I tell him no. He won't listen. Still coming after me. He's in this crazed sprint. Then in this motion where he's reaching by his side I tell him no and stop. He won't. I draw my weapon and I point it at him. Tell him again no and stop and he won't and that's when I fired. He took a few more steps -- all of this is while I'm running backwards, cutting back to the left -- he took a few more steps even after he was shot.

…

Q: When you initially shot [the victim] in the park, when he was coming at you, when you told him to stop and he didn't stop and then you shot him, did you know where you shot him?

A: I believed it was in his shoulder.

…

Q: What were you trying to do?

A: I was trying to defuse the situation. I wasn't trying to do anything. I wasn't trying -- just trying to get away. I wasn't trying to do anything to him. He just wouldn't stop. I was pinned in a corner I had nothing else to do at this point. He wouldn't stop. I see him coming after me drawing for something, to draw a weapon. I pointed in his direction and he lunges at me even harder. He doesn't slow down.

…

Q: Okay. And you said that you believed that he had a weapon.

A:     He always does.

Q:     How do you know?

A:     Because I know him.  I went to school with him.  He always has a folding knife on him and I also had had conversations with him many times about firearms and he was going to be getting his concealed weapons permit when he turned 21.  I figured since he was drinking he was 21 as well so –

Q:     Well, you actually have a license to carry, right?

A:     Yes.

…

Q:     … So would it be fair to say that [the victim] was in mid-lunge when you shot him?

A:     Yes, that's more than fair.

…

Q:     And how long did it take from the time that you heard his footsteps behind you till the time you shot him?  How much time?

A:     Moments.

Q:     Moments or seconds?

A:     I guess it would be measured in seconds, maybe a second or two at most.  As fast as you can - - as fast as you can scream no and stop twice.

…

Q:     And he was yelling things?

A:     He was going to kill me.

Q:     Did you believe him?

A:     Of course I [did].  I thought I was going to die.  It was crazy.

Q:     Did you believe that you needed to use that kind of force to protect yourself from death or serious bodily injury?

A:     Yes.  I was just trying to avoid -- I was trying to get away.  That's it.  Just trying to defuse the situation.  If I didn't do that he would have killed me.

…

Q:     As [the victim wa]s chasing you down through Community Park you say that he's reaching?

A:     Yes.

…

Q:     But you weren't focused on him reaching you're focused on his eyes?

A:     Well, at first I saw him reach.  I know a draw when I see one and then after that I was continuing to look at him as I was screaming no and stop.  When you are trying to talk with somebody you look at them especially when you're giving them a command that way they know who you're talking to.

Q:     And you weren't sure if he was reaching what he was reaching for?

A:     He was definitely drawing something.  I'm assuming by the fact that he stated that he wanted to kill me it was an object to kill me.  He was in a draw stance.

Q:     Well, what did you see him draw?

A:     I really couldn't see what he drew.  I wish I could have, but I wasn't really -- I wasn't really -- it was a very crazy situation.  Happened so fast.

> Details are -- he didn't even -- I don't even think he -- I mean he's still down there.

N.T., 8/15/12, at 66, 69, 70-71, 73-74, 75, 79, 80, 81-81, 107-108.

Based on the above testimony, in my view, Appellant established the necessary prerequisites for a "Stand Your Ground" instruction. First, Appellant was not the initial aggressor. *Id.* at 69, 70-71. Second, Appellant was in a park, so he therefore "ha[d] a right to be in the place where he was attacked[.]" 18 Pa.C.S.A. § 505(b)(2.3)(i). Also, Appellant testified that he "believe[d] that [he] needed to use that kind of force to protect [him]self from death or serious bodily injury[.]" N.T., 8/15/12, at 81.

However, as to Section 505(b)(2.3)(iii)(B), the Commonwealth argues, and the trial court concluded, that Appellant did not meet the requirements , that the victim must at a minimum "display[] or use[] … any [] weapon readily or apparently capable of lethal use." 18 Pa.C.S.A. § 505(b)(2.3)(iii). The trial court's analysis and the Commonwealth's argument focus on the fact that the victim did not "display[] or otherwise use[]" a weapon. 18 Pa.C.S.A. § 505(b)(2.3)(iii); *see also* Trial Court Opinion, 4/2/13, at 22 (stating, "[t]here was no evidence that [the victim] **had** a weapon[]") (emphasis added); Commonwealth's Brief at 8 (stating, "there was no testimony … to support a conclusion the victim **displayed** a weapon[]") (emphasis added). The text of Section 505(b)(2.3)(iii) says "the person against whom the force is used **displays**[.]" *Id.*

Section 505(b)(3) states that a defendant "may **estimate** the necessity [of deadly force] under the circumstances **as he believes them to be** when the force is used, without retreating …." 18 Pa.C.S.A. § 505(b)(3) (emphases added). The trial court and the Commonwealth reject Appellant's arguments based on the circumstances as they **actually were**, not as Appellant perceived them to be. *See* Trial Court Opinion, 4/2/13, at 22-23; Commonwealth's Brief at 7-9. After careful review, I agree with Appellant's assertion that the trial court impeded the role of the jury and improperly weighed the evidence.

The crux of the issue on this appeal is thus whether the self-defense doctrine of "Stand Your Ground" applies where the weapon is not actually "display[ed] or use[d]." 18 Pa.C.S.A. § 505(b)(2.3)(iii). Clearly, assuming compliance with all of the other statutory requirements, in a situation where a lethal weapon is used by an aggressor, but not displayed, "Stand Your Ground" would apply. Thus, a visualization of the lethal weapon is not critical to the analysis. The question then becomes, where the lethal weapon is not displayed, but the actions of the aggressor intimate the "use" of a lethal weapon, does "Stand Your Ground" still apply? In my view, it does.

The fact that the trial court disagreed and believed that "deadly force was not necessary" was legally irrelevant to the issue, as that was for a jury to decide. Trial Court Opinion, 4/2/13, at 22; *see also Commonwealth v.*

*Mayfield*, 585 A.2d 1069, 1071 (Pa. Super. 1991) (*en banc*) (stating that a trial court must give the self-defense instruction "even though the evidence of self-defense may appear to the trial court as not credible[]"). As to Section 505(b)(2.3)(iii)(B), Appellant testified that he perceived the victim "using" the weapon by reaching down to draw and lunging at him. N.T., 8/15/12, at 107-108. In my view, when read together, Sections 505 (b)(2.3)(iii) and (b)(3) permitted Appellant to "estimate" the necessity of deadly force to the extent permitted by the Stand Your Ground provisions, based on the circumstances known to him at the moment "when the force [wa]s used[.]" 18 Pa.C.S.A. § 505(b)(3). Stated another way, the circumstances as Appellant perceived them led him to believe and "estimate" that the victim was reaching for a knife or a gun. The trial court acknowledged twice that Appellant "alleged that he thought he saw a weapon[.]" N.T., 8/15/12, at 158; *accord* Trial Court Opinion, 4/2/13, at 23. As a result, I believe Appellant met Section 505(b)(2.3)(iii)'s requirements sufficiently to warrant the instruction.

I wish to emphasize that I take no position as to whether the jury would have believed Appellant, or whether a jury should believe him. The only question this Court is confronted with in this appeal is whether Appellant was entitled to the jury instruction. When the evidence presented by Appellant through his own testimony, at a minimum, is looked at from his vantage point, in my view, he did present sufficient evidence to satisfy all of

Section 505(b)(2.3)'s requirements. As a result, I conclude the trial court abused its discretion when it denied Appellant's request for the jury instruction. ***See Antidormi***, ***supra***. Accordingly, I would reverse the judgment of sentence and remand the case for a new trial. I respectfully dissent.