J-S66001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

Appellee

v.

STEPHEN PAUL COULSON

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 699 WDA 2014

Appeal from the Judgment of Sentence March 10, 2014
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0008360-2013

BEFORE:  OLSON, STABILE and STRASSBURGER,* JJ.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 05, 2016**

Appellant, Stephen Paul Coulson, appeals from the judgment of sentence of seven and one-half (7½) to fifteen (15) years of incarceration entered on March 10, 2014, after Appellant pled guilty to aggravated assault, burglary, criminal trespass, and recklessly endangering another person (REAP).[1]  Upon review, we affirm.

On January 22, 2014, Appellant appeared before the trial court and entered his plea to the above charges.[2]  The Commonwealth stated it was withdrawing a charge of criminal attempt – homicide, in exchange for the plea.  N.T., 1/22/14, at 2.  The trial court ordered a pre-sentence report.

_____

[1] 18 Pa.C.S.A. §§  2702, 3502, 3503 and 2705, respectively.

[2] The facts underlying Appellant's convictions are detailed below in our analysis.

*Retired Senior Judge assigned to the Superior Court.

On March 10, 2014, the trial court convened a sentencing hearing. The trial court heard from counsel, Appellant, and the victim's two daughters. The trial court additionally considered written statements from the victim's other daughter and son. At the conclusion of the hearing, the trial court sentenced Appellant to seven and one-half (7½) to fifteen (15) years of incarceration for the aggravated assault conviction. The trial court sentenced Appellant to a consecutive five (5) years of probation for the burglary conviction, and imposed no further penalties for the criminal trespass and REAP convictions.

On March 17, 2014, Appellant filed a timely post-sentence motion to modify sentence, which, after conducting a hearing on April 3, 2014, the trial court denied on April 9, 2014. Appellant filed this timely appeal on May 2, 2014. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents four sentencing issues for our review:

1. Should the sentence imposed upon Appellant Coulson be vacated, and his case remanded for re-sentencing, owing to the fact that the sentencing court in this case, in imposing a beyond-the-aggravated-range non-guidelines sentence, purported to sentence within the sentencing guidelines but applied those guidelines erroneously (a situation that 42 Pa.C.S. § 9781(c)(1) indicates requires the granting of sentencing relief)?

2. Should the sentence imposed upon Appellant Coulson be vacated, and his case remanded for re-sentencing, owing to the fact that the sentencing court's 42 Pa.C.S. § 9721(b) statement of sentencing rationale indicated that Appellant was sentenced as he was because the

nature of the offense that he committed (a situation that § 9721(b) itself indicates constitutes grounds for the awarding of sentencing relief)?

3. Should the sentence imposed upon Appellant Coulson be vacated, and his case remanded for re-sentencing, owing to the fact that the non-guidelines sentence imposed upon him was unreasonable in view of the totality of the circumstances (a situation that 42 Pa.C.S. § 9781(c)(3) indicates requires the granting of sentencing relief)?

4. Are not all of the foregoing legal theories properly before th[e Superior] Court owing to the fact that defense counsel in the sentencing court expressly and repeatedly argued that a shorter prison sentence should be imposed upon Appellant than was imposed?

Appellant's Brief at 3-4.

All of Appellant's four issues are interrelated, such that we address them together. In each issue, Appellant objects to the length of his sentence, and thus challenges the discretionary aspects of his sentence. *Commonwealth v. Rhoades*, 8 A.3d 912, 915 (Pa. Super. 2010) (claim that sentence is excessive is a challenge to the discretionary aspects of a sentence). It is well-settled that "sentencing is a matter vested in the sound discretion of the sentencing judge, whose judgment will not be disturbed absent an abuse of discretion." *Commonwealth v. Ritchey*, 779 A.2d 1183, 1185 (Pa. Super. 2001). Moreover, pursuant to statute, Appellant does not have an automatic right to appeal the discretionary aspects of his sentence. *See* 42 Pa.C.S.A. § 9781(b). Instead, Appellant must petition

this Court for permission to appeal the discretionary aspects of his sentence.

*Id.*

Recently, this Court reiterated:

> The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal. *See* [*Commonwealth v. Hoch*, 936 A.2d 515, 518 (Pa. Super. 2007)] (citation omitted). An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence.
>
> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.
>
> *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (citations omitted).

*Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265-1266 (Pa. Super. 2013) (*en banc*), *appeal denied*, 104 A.3d 1 (Pa. 2014).

> "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Glass*, 50 A.3d 720, 727 (Pa. Super. 2012) (citations and internal quotation marks omitted).

*Buterbaugh*, 91 A.3d at 1266.

Instantly, Appellant filed a timely notice of appeal, preserved his sentencing challenge in his post-sentence motion to modify sentence, and included a separate Rule 2119(f) concise statement in his appellate brief. *See* Appellant's Brief at 17-22. To the extent Appellant argues that the trial court failed to consider certain factors, his assertion that the trial court failed to consider mitigating facts of record does not raise a substantial question. *Buterbaugh*, 91 A.3d at 1266. However, with regard to Appellant's contention that the trial court sentenced him beyond the guidelines to what the trial court "mistakenly believed was an aggravated range guideline sentence," and misapplied the sentencing guidelines "in view of the totality of the circumstances," such claims present substantial questions. *See* Appellant's Brief at 3; *Commonwealth v. Cook*, 941 A.2d 7, 11 (Pa. Super. 2007) (claim that the sentencing court misapplied the sentencing guidelines presents a substantial question); *Commonwealth v. Eby*, 784 A.2d 204, 206 (Pa. Super. 2001) (claim that the sentencing court imposed an unreasonable sentence by sentencing outside the guideline ranges presents a substantial question). This, we will consider those claims.

In examining the merits of Appellant's claims, we recognize that the primary consideration in our review of the discretionary aspects of a sentence imposed by a trial court is whether the court imposed an individualized sentence, and whether the sentence was nonetheless unreasonable for sentences falling outside the guidelines. *Commonwealth*

*v. Coulverson*, 34 A.3d 135 (Pa. Super. 2011). Also, "[a] trial court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa. Super. 2010), *appeal denied*, 13 A.3d 475 (Pa. 2010).

Here, our thorough review of the record as a whole reveals that the sentence imposed by the trial court – albeit outside of the guidelines, and with a misstatement by the trial court – was not unreasonable, and reflected the trial court's consideration of the facts of the crime and the character of Appellant. We recount our review of the record in detail below because of its relevance to our analysis.

At sentencing, the Commonwealth explained that the victim hired Appellant and worked with him on the day of the attack. N.T., 3/10/14, at 17. That evening, while the victim was asleep in his home, Appellant attacked him with a hammer, causing the victim to receive sixty-two (62) stitches and to suffer from continuing dizziness until the present day. *Id.* "At the hospital, [the victim] was told if the hammer had hit his temple, it would have killed him." *Id.* The Commonwealth stated that the standard guideline sentence for Appellant was thirty-six (36) to fifty-four (54) months of incarceration, and indicated it was looking for a sentence that was at least within the standard range. *Id.*

Appellant's counsel noted that although Appellant was a veteran and served two combat tours, he was rejected from both Veterans Court and Mental Health Court "because of the seriousness of this crime." *Id.* at 5. Appellant's counsel explained:

> Because of the seriousness of this crime, Your Honor. It was an attempted homicide. He's now pled guilty to the crime of aggravated assault. He struck a sixty-five-year-old man in the head with a hammer, so I believe that's why it was rejected from the specialty court programs, like Mental Health Court, Drug Court, Veterans Court.

*Id.* at 5-6. Appellant's counsel requested that the trial court sentence Appellant in the mitigated range of the guidelines to a minimum of twenty-four (24) months of incarceration.

Thereafter, the trial court commented:

> That's the amazing part of it to me. Here's somebody who has a past, who has a criminal record. You use drugs. You abuse drugs. You've been thrown out of the [A]rmy. You've been basically cast to the side by basically everyone over your years, and the hand that [the victim has] extended to you, what do you do? You smash some man in the head while he sleeps in his bed.
>
> ***
>
> How do you do that to a friend, someone who extends the hand of help to you, someone who offers you a job, someone who pays you, someone who has extended that random act of kindness to you?

*Id.* at 7.

Appellant responded that there was "no excuse" for what he did. *Id.*

- 7 -

Although the victim was present, the Commonwealth stated that he "was too upset to speak." *Id.* at 8.

Two of the victim's daughters testified. Ms. Dana Valerio stated that Appellant's attack on her father "changed her life forever" and "has been the most difficult time of [her] life." *Id.* at 9. Ms. Valerio detailed the impact of the crime on the victim and his family:

> May 30, the day before the crime, was spent at Kennywood Park as a family, watching my dad take turns riding rides with seven of his ten young grandchildren all under the age of nine. The next time I would speak to my dad would be in the early morning hours of June 1st at 2:09 a.m. when I received a call from my father who notified me of the home invasion and the brutal attack that took place and that he needed our help. That conversation I will never forget. I told him that I would drive him to the hospital and my brother-in-law Scott would stay at his house with the police as they processed the crime scene. I will always remember the shakiness in his voice when he said, "I want Scott to take me. I don't want you girls to see me like this." However, nothing could have prepared me for the violent scene I was about to witness.
>
> I was met at my childhood home by police officers and detectives who walked me through my father's house pointing out evidence of the attack … The blood-spattered walls and floors, the light switch and the wall … covered in blood and the obvious signs of the struggle that took place … are images I will never forget. … My siblings and I feel that our childhood home has forever been changed. A place that once held so many wonderful memories has been overshadowed by the horrific events of that night.
>
> In the weeks following the attack, I watched my father struggle with many different emotions, anger, frustration and confusion, about why a person he

tried to help would carry out such a malicious attack as he slept defenselessly in his bed. We, as his children, were worried for his health and safety. My sister Diana and I shared the task of having him stay with us for over two months as he recovered from his injuries. In addition to his physical injuries, we observed him having difficulty sleeping. He would wake frequently during the night with nightmares of the attack. Trying to shield his grandchildren from the details of the attack, coordinating doctors' appointments and cleaning up his home were equally challenging.

Our family's summers are usually spent at my dad's house swimming at the pool, taking boat rides and going on trips. Instead, we spent most of that summer calling, e-mailing and meeting with biohazard removal teams, a carpet company, home security system installers, a door replacement company and a homeowners insurance agent to repair his home from the damage. All of these tasks were very time-consuming and many times required us to be absent from work until the process was completed.

The events that transpired on June 1st, 2013, did not only change my father's life, it changed the lives of our entire family.

*Id.* at 10-12.

A second daughter, Mrs. Diana Seabol, testified that she felt responsible for "bringing [Appellant] into our lives" because she and her husband had hired Appellant to perform contracting work on their home and rental properties. *Id.* at 13. Mrs. Seabol also detailed the impact of the crime:

The overwhelming amount of guilt and anger has led me to many sleepless and restless nights. On those same nights my thoughts shift to my father. I lay awake and think of how he feels trying to sleep in

the same house, in the same room and in the same bed where he was awoken to the smashing of a hammer to his temple.

My father is a hard-working businessman whose only fault was wanting to help a guy who was down on his luck. My dad is the rock of our family. He is the person we all go to when we need help with anything, and after his attack he was the one that needed my help. My sisters and I had to shuffle my father between our houses to monitor his recovery and to lessen our own missed days of work. He stayed at my house most of the time while he recovered from his injuries. He lived at my house for at least two months because I was so concerned for his health and safety. He lives alone and was suffering from debilitating headaches. He complained of how the light and noise were so bothersome to him. He also mentioned a constant ringing in his ears that lasted for weeks. He suffered from dizziness and blurred vision. He could not be left alone.

I had to take off numerous days of work without pay to monitor him and to drive him to many of his follow-up doctors' appointments. I have twin nine-year-old boys and a four-year-old daughter who I had to lie to about what had happened to their grandfather because I didn't want to scare them. We had to be careful of what we said around them when we were calling doctors or family to update them on my father's condition. My boys have since overheard and discovered what happened to their grandfather and continue to ask questions and worry about his well-being.

My father had no health insurance. He is self-employed. In the weeks following the attack, he constantly agonized over how he was going to pay for his financially overwhelming medical bills. He only allowed us to get the treatment the doctors deemed absolutely necessary and skipped the rest because he [didn't know] how he was going to pay for it.

I can describe those weeks as emotionally and physically draining for my entire family. We were still in shock that this happened. The array of emotions are overwhelming; anger, guilt, pain, sadness, shock, wondering how someone could do such a horrific thing, mixed with joy, happiness, thankfulness and love that my dad was still alive. I could not imagine my life without him in it.

I have taken steps to insure his safety by immediately calling to have his home security system updated to the latest technology. I continue to worry about him so much that I had the monitoring system set up so I am e-mail-alerted every time his alarm arms or disarms. Since he has returned to his home, I vigilantly check it every morning and every evening and sometimes in the middle of the night just to make sure he's locked in and secure in his home.

I ask that Your Honor invoke the maximum sentence allowed by law to [Appellant] for his violent and vicious attack on my father. This attack has taken away my family's sense of security. [Appellant] has taken away my father's willingness to help others, and I think that's the most tragic thing of all, and my family will never be the same. Thank you.

*Id.* at 13-15.

After Mrs. Seabol's testimony, the Commonwealth provided the trial court with written statements from the victim's daughter, Maureen Loyer, and his son, Mark Winzek, who did not speak on the record. *Id.* at 16.

Appellant spoke on his behalf, and apologized to the victim and his family:

I wrote a statement, but I memorized it. I'm sorry Joe. I have problems with it too. I have issues with it too. When I replay what I did in my head, I have problems with it myself.

- 11 -

Scott, I am sorry. I was in your dad's house. You guys did give me work when I needed work. I can't understand why I did what I did, to be honest with you.

Joe's business is a block from my house, and I've been down there in the mornings – every morning for coffee. I take my little boy down there, and Joe puts him on the counter. He slices up watermelon and gives me food when I need it. I'm sorry, but as his father – I'm so sorry, man. I really am. And I can't understand why I did what I did. Joe is a good man, and he's helped me a lot of times, and so has Scott. I'm just sorry. I look at you, and I really am. I don't even know why I did what I did. I can't even recall it, and I think about it all the time. I think about what you guys had to go through too, because I think about if it was my father, what I would feel, and I don't have [any] excuse, and I can't use drugs as an excuse because I know what they do, and I can't use that as an excuse, and I'm not going to. That's all I have.

*Id.* at 18.

After hearing from the victim's family and Appellant, the trial court offered the following detailed rationale for its sentence:

I've considered the sentencing guidelines, the nature of the charges, the fact that [Appellant has] accepted responsibility by pleading guilty. I've considered [Appellant's] statement to the [trial c]ourt, [Appellant's] apologies to the victim in open court. I've considered also [Appellant's] lawyer's statements and arguments on [Appellant's] behalf. I've considered the Commonwealth's attorney's arguments on behalf of the Commonwealth and the victim. I've considered the contents of the presentence report, including [Appellant's counsel's] amendments and – or corrections, rather, to a subsection with page six, the third block regarding an incident on January 31st of 1999 while [Appellant] apparently was in the military, the Army. I've also

- 12 -

considered the letters that have been written on behalf of the victim; his daughter, Maureen Loyer; Mark Winzek; Dana Valerio, who testified in open court today; Diana Seabol, who also testified in open court. I've considered the viciousness and the nature and seriousness of this offense, the apparent lack of provocation or any reasonable or rational basis for this, and as well and as importantly, the impact on the victim and his family that continues as well as the financial impact. I have a proposed Order of Court for $6,068.56 and $1,000 for restitution. And the punitive, rehabilitative and deterrent aspects of sentencing. I've also considered [Appellant's] long history of drug abuse that's apparently been interwoven with [Appellant's] life in the military and even after [Appellant had] gotten out which continues up to and through the events of this criminal episode.

For all those reasons, it's the judgment and sentence of the [trial c]ourt at Count 2 that [Appellant] be sentence to not less than seven and [one-]half nor more than fifteen years at a state correctional facility to be determined by the Department of Corrections.

\*\*\*

This is in the aggravated range of the sentencing guidelines, and the reasons are the seriousness of the offense, the unprovoked nature of the attack, the long-standing impact on the victim and his family, and [Appellant's] history. Even though [Appellant has] a prior record score of zero, [Appellant has] had a lot of contact with the criminal justice system both as a civilian and the military that seems to be a common thread also with drug abuse that [Appellant has] neglected to get under control in all of these years.

*Id.* at 18-20.

Although the trial court misspoke when explaining that its sentence was "in the aggravated range," it later acknowledged that the sentence was outside of the guidelines, and stated:

> The [trial] court misspoke when it stated the sentence was in the aggravated range. (N.T. 1, p. 20). The sentence, in fact, exceeds the aggravated range of the applicable sentencing guidelines. The [trial c]ourt intended to sentence [Appellant] to 7½ - 15 years plus probation, and placed its reasons on the record.

Trial Court Opinion, 3/24/15, at 5.

In addition, as noted above, Appellant filed a motion to modify sentence, and the trial court convened a hearing on April 3, 2014. At the hearing, Appellant's counsel's reiterated Appellant's prior record score of zero, and asserted that the attack was an "isolated incident," and Appellant's "first run-in with any crime of violence." N.T., 4/3/14, at 3. Appellant's counsel argued, "While the facts of this case are not mitigated, the person is. There's a lot of mitigating circumstances about [Appellant]." *Id.* Appellant's counsel recounted Appellant's military tours of duty in Somalia and Haiti, his diagnosis of Post-Traumatic Stress Syndrome, and his demonstrated remorse. *Id.* at 4. Again, Appellant apologized to the victim in open court. *Id.* at 4-5.

The Commonwealth responded that it did not seek "only a standard range sentence," and repeated the victim's continued health challenges. *Id.* at 5-6. Subsequently, and significantly, the trial court commented:

> I feel that the sentence – I gave it a lot of thought, especially with the presentence investigation, [and] all the testimony entered at that time. I felt it was an appropriate sentence then. I still feel it's an appropriate sentence.

*Id.* at 7.

In assessing the reasonableness of an extra-guidelines sentence, we, as a reviewing court, must look at the nature and circumstances of the offense, the history and characteristics of the defendant, the opportunity of the sentencing court to observe the defendant, the presentence investigation report, the findings on which sentence was based, and the sentencing guidelines. *Commonwealth v. Septak*, 518 A.2d 1284 (Pa. Super. 1986). Here, our review of the entire record confirms that the trial court, after careful and thorough consideration of the relevant factors, tailored Appellant's sentence to the particular circumstances of this case. Hence, we do not find that Appellant's sentence is unreasonable. Given the foregoing, we discern no abuse of discretion by the trial court, and conclude that Appellant's sentencing issues are without merit.

Judgment of sentence affirmed.

Judge Stabile joins this memorandum.

Judge Strassburger files a Dissenting Memorandum.

Judgment Entered.

- 15 -

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/5/2016</u>