J-S10013-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JONATHAN DIXON, | |
| Appellant | No. 3141 EDA 2015 |

Appeal from the Judgment of Sentence Entered October 8, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000051-2015

BEFORE:  BENDER, P.J.E., DUBOW, J., and SOLANO, J.

MEMORANDUM BY BENDER, P.J.E.:　　　　　　　　**FILED MARCH 03, 2017**

Appellant, Jonathan Dixon, appeals from the judgment of sentence of two to four (2-4) years' imprisonment followed by three (3) years' probation, imposed after he was convicted of, *inter alia*, aggravated assault, 18 Pa.C.S. § 2702(a)(4). On appeal, Appellant challenges the sufficiency of the evidence to support his conviction of aggravated assault. We affirm.

Appellant's conviction stemmed from an October 17, 2014 incident at Horizon House, a transitional housing complex, located in Philadelphia, Pennsylvania. In brief, on the day at issue, Appellant visited Horizon House's office to speak to Program Manager Ralph Green about a problem with his housing plan. Shortly after a verbal argument between Appellant and Mr. Green took place, Appellant grabbed Florence Ray, another Horizon House employee working at the time, by her throat, threw her against a bathroom door, and struck her once in the back of the head with a desk

lamp. Following a non-jury trial on July 30, 2015, the trial court determined that Appellant used the lamp against Ms. Ray as a deadly weapon and he was convicted of aggravated assault, 18 Pa.C.S. § 2702(a)(4), in addition to possessing an instrument of crime, 18 Pa.C.S. § 907(a); simple assault, 18 Pa.C.S. § 2701(a); and recklessly endangering another person, 18 Pa.C.S. § 2705. *See* Trial Court Opinion (TCO), 5/9/16, at 1. As stated above, Appellant was sentenced to two to four (2-4) years' incarceration followed by three (3) years' probation for the aggravated assault offense, and there was no further penalty imposed for the remaining offenses. *Id.* The trial court also ordered Appellant to submit to mental health treatment/counseling and medication as deemed appropriate, and imposed mandatory court costs on him. *Id.* at 2. Subsequently, on October 15, 2015, Appellant filed a timely notice of appeal. *Id.* The trial court thereafter ordered Appellant to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied. *Id.*

On appeal, Appellant raises the following issue for our review:

Was the evidence insufficient as a matter of law to establish aggravated assault as a felony of the second degree, 18 Pa.C.S. § 2702(a)(4), which requires the use of a deadly weapon, because striking a person one time with the lampshade end of a small desk lamp does not make the lamp a deadly weapon as it was not intended, calculated, or likely to cause death or serious bodily injury?

Appellant's Brief at 3.

Initially, we set forth our standard of review:

A claim challenging the sufficiency of the evidence presents a question of law. We must determine "whether the evidence is

- 2 -

sufficient to prove every element of the crime beyond a reasonable doubt." We "must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict."

Our Supreme Court has instructed:

[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Thomas**, 65 A.3d 939, 943 (Pa. Super. 2013) (internal citations omitted).

A person is guilty of aggravated assault if he "attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]" 18 Pa.C.S. § 2702(a)(4). In turn, a deadly weapon is defined as "[a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. § 2301.

In addressing what constitutes a deadly weapon for purposes of applying the deadly weapon enhancement at sentencing, this Court has previously explained that,

> "[i]tems not normally classified as deadly weapons can become so based upon their use under particular circumstances." ***Commonwealth v. Rhoades***, 8 A.3d 912, 917 (Pa. Super. 2010) (intact glass bottle qualified as a deadly weapon). We found many examples in our cases: … ***Commonwealth v. Scullin***, 414 Pa. Super. 442, 607 A.2d 750 (1992) (tire iron thrown at victim was a deadly weapon); ***Commonwealth v. Cornish***, 403 Pa. Super. 492, 589 A.2d 718, 721 (1991) (fireplace poker used to strike victim constitutes a deadly weapon); ***Commonwealth v. Brown***, 402 Pa. Super. 369, 587 A.2d 6, 7 (1991) (saw used to stab victim was a deadly weapon); ***Commonwealth v. Chapman***, 365 Pa. Super. 10, 528 A.2d 990 (1987) (straightedge razor placed at the face of an individual is a deadly weapon).

***Commonwealth v. Buterbaugh***, 91 A.3d 1247, 1269 (Pa. Super. 2014) (*en banc*).[1] ***See also Commonwealth v. Prenni***, 55 A.2d 532, 533 (Pa.

---

[1] In his brief, Appellant relies on cases examining whether certain objects constitute deadly weapons in the context of applying the deadly weapon enhancement to sentences. ***See*** Appellant's Brief at 11-13 (citing, among other cases, ***Buterbaugh***, ***supra***). We note that, in ***Buterbaugh***, this Court observed that "[t]he Crimes Code provides an almost verbatim definition of deadly weapon as the one set forth in the Sentencing Guidelines[.]" ***Buterbaugh***, 91 A.3d at 1269 (comparing the definition of deadly weapon under 18 Pa.C.S. § 2301 with the requirements for the deadly weapon enhancement under 204 Pa. Code § 303.10(a)). To be sure, the Sentencing Guidelines provide that, under 204 Pa. Code § 303.10(a)(2)(iii), an offender has used a deadly weapon if "any device, implement, or instrumentality capable of producing death or serious bodily injury" was employed by the offender in way that threatened or injured another individual. 204 Pa. Code § 303.10(a)(2)(iii). While we agree that the Crimes Code and Sentencing Guidelines have similar definitions for what constitutes a deadly weapon, Appellant aptly recognizes that "Section 2301[] requires that the item is 'likely' to cause such injury. Conversely, the

*(Footnote Continued Next Page)*

- 4 -

1947) ("An ax, a baseball bat, an iron bar, a heavy cuspidor, and even a bedroom slipper have been held to constitute deadly weapons under varying circumstances[.]") (citation omitted); **Commonwealth v. Raybuck**, 915 A.2d 125, 129 (Pa. Super. 2006) (concluding that mouse poison "became a deadly weapon when [the a]ppellee included it in the sandwich that she prepared for her husband to consume"); **Commonwealth v. Nichols**, 692 A.2d 181, 184 (Pa. Super. 1997) (recognizing that "[a] baseball bat, when swung at the head, can be a very deadly weapon….") (citation omitted).

In the case *sub judice*, the trial court summarized the totality of evidence presented at Appellant's non-jury trial as follows:

> The Complainant, Florence Ray, identified [Appellant], Jonathan Dixon[,] and testified that she knew him as William Dixon.  Ms. Ray explained that she knew [Appellant] in her capacity as a case manager for transitional housing at Horizon House and that he was a client there.
>
> Ms. Ray testified that on October 17, 2014, at approximately 1:45 p.m., she was working at Horizon House, located at 155 Godfrey Avenue in Philadelphia, Pennsylvania. When asked to describe the location, Ms. Ray explained that Horizon House is located in a two bedroom apartment[,] within an apartment complex[,] which is used as an office.  She testified that the program manager, Mr. Ralph Green, uses the master bedroom as an office and that there is also a conference room, a living room, a dining room[,] and a kitchen in the office. Ms. Ray stated that she shares the front room with her coworker as their office.

*(Footnote Continued)* ———————————

standard for applying the deadly weapon enhancement under Pennsylvania's Sentencing Guidelines requires that the instrument is merely 'capable' of causing serious injury or death."  Appellant's Brief at 14 (citations and emphasis omitted).  We keep in mind this difference pointed out by Appellant when conducting our analysis *infra*.

Ms. Ray testified that she saw [Appellant] on the afternoon in question when he came to the office because he wanted to speak with the program manager, Mr. Green, about his dissatisfaction with the housing opportunity given to him. Ms. Ray testified that she had worked with [Appellant] for about eighteen (18) months and that she did not have any problem with him during that time. Ms. Ray stated that when someone wants to come into the office[,] they have to ring a bell to be let in. After the bell is rung, she opens the door to check who it is before buzzing them into the apartment.

Ms. Ray testified that she opened the door for [Appellant] on the day in question and noticed he was upset. Ms. Ray stated that [Appellant] asked to speak with Mr. Green. Ms. Ray testified that she then knocked on Mr. Green's office door and informed him that [Appellant] was there to see him. Ms. Ray testified that she was then told by Mr. Green to have [Appellant] take a seat and that Mr. Green would be right with him. She stated that she then sat at her desk where she was still able to see into the living room area. Ms. Ray added that the only doors in the unit included the door to Mr. Green's office, the bathroom door, and the conference room door. She stated that they did not have "per se offices" but rather a space with desks and a computer.

Ms. Ray stated that [Appellant] took a seat and she then waited for Mr. Green to call [Appellant] into his office. Ms. Ray testified that when Mr. Green called for [Appellant], she walked [Appellant] into Mr. Green's office and then returned to her desk. She stated that [Appellant] and Mr. Green were in the office together but that she could not recall whether the door was open or closed. When asked whether there was a wall or separation between Mr. Green's office and her office area, Ms. Ray stated that there was a separation. Ms. Ray testified that next it became loud in the office and that she recognized [Appellant's] voice yelling "are you calling me a f'ing liar[?]" []

Ms. Ray testified that the only individuals in the office at the time were Mr. Green, [Appellant], and herself. Ms. Ray stated that when she heard [Appellant's] yelling, she retrieved the telephone number of the housing placement to give to Mr. Green. Ms. Ray stated that when she went back into Mr. Green's office to provide him with the number, he told her to have a seat. Ms. Ray stated that [Appellant] and Mr. Green then stopped yelling and began to talk in a regular conversational tone. Ms. Ray testified that when Mr. Green informed

[Appellant] of what he was going to do for him[,] she saw that things became calm and she decided to leave the room.

Ms. Ray testified that she was on her way back to her office, located about ten (10) feet from Mr. Green's office, when she was grabbed by [Appellant]. Ms. Ray explained that when she left Mr. Green's office, Mr. Green was sitting behind his desk and that [Appellant] was sitting on one (1) of the three (3) chairs in the office, specifically the one closest to the office door. Ms. Ray stated that she had been sitting in the chair closer to Mr. Green's desk. Ms. Ray then testified that she did not know that [Appellant] got behind her when she was leaving Mr. Green's office, and that [Appellant] grabbed her by her throat and threw her against the bathroom door. Ms. Ray indicated how [Appellant] grabbed her by bringing her right hand in front of her throat area.

Ms. Ray explained that the bathroom door is about two (2) feet from Mr. Green's office door and on the way to her office. Ms. Ray testified that when [Appellant] came up behind her, she saw it was [Appellant] … because he turned her around. Ms. Ray stated that [Appellant] was squeezing her neck with his hands on her throat but affirmed that she could speak and breath[]. She stated that she then screamed for Mr. Green. Ms. Ray testified that when [Appellant] threw her up against the bathroom door[,] the door was ajar. Ms. Ray stated that she could not stop [Appellant] or control her own movements. She explained that when [Appellant] grabbed her[,] she fell to the ground on her right knee and[,] at that point[,] Mr. Green came out of his office and grabbed [Appellant]. Ms. Ray testified that she somehow ended up in the conference room.

Ms. Ray stated that she is five feet and two inches (5'2") tall. Ms. Ray further testified that she weighs about one hundred and fifty (150) pounds. Ms. Ray estimated that [Appellant] was taller than her at about six feet three inches (6'3") tall and approximately two hundred and thirty (230) pounds. Ms. Ray testified that when she fell to the ground[, Appellant] was holding onto her neck the entire time. Ms. Ray held her right hand in front of her face to demonstrate for the [c]ourt where [Appellant's] hand was when she fell.

Ms. Ray testified that after Mr. Green grabbed [Appellant,] he tried to escort him out. Ms. Ray stated that somehow [Appellant] broke free and came after her in the conference room. Ms. Ray testified that [Appellant] next grabbed a table

lamp and hit her over the head. Ms. Ray stated that Mr. Green came back into the conference room and then escorted [Appellant] out.

Ms. Ray testified that the conference room is approximately two (2) feet to the right of the bathroom door. When Mr. Green first came out of his office to grab [Appellant] off of her[,] she was able to stand up. Ms. Ray stated that she could only recall next ending up in the conference room. She testified that when she was inside the entrance of the conference room, [Appellant] was behind her.

Ms. Ray testified that the desk lamp that [Appellant] hit her with was on top of the conference table. Ms. Ray described the desk lamp as old fashioned with a button and a fluorescent light bulb. She also stated that the lamp had a brown cover, a steel case at the bottom, and a shiny neck. Ms. Ray testified that when [Appellant] hit her with the lamp, the light bulb inside the cover shattered. Ms. Ray indicated with a hand gesture and orally confirmed that the lamp was about one (1) foot tall and the steel base of the lamp was approximately six (6) inches wide.

Ms. Ray testified that she did not know what part of the lamp hit her and the only thing she could remember was that the light bulb had shattered. Ms. Ray testified that [Appellant] hit her towards the back of the right side of her head. Ms. Ray testified that she felt numb right after being hit and she realized she was bleeding. Ms. Ray demonstrated that she had her left arm up and bent over her face when [Appellant] hit her. Ms. Ray testified that she received a scratch when [Appellant] struck her with the lamp and that he struck the arm bent over head. Ms. Ray stated that she thinks that her arm, which protected her head, actually saved her.

Ms. Ray testified that upon getting hit in the head with the lamp[,] she next ran into the bathroom. She testified that she was still able to see where [Appellant] and Mr. Green were[,] and that Mr. Green then escorted [Appellant] out of the front door. She stated that she was not paying attention to the demeanor of [Appellant] but was more concerned with her head. Ms. Ray testified that she was shaken up and crying. Ms. Ray testified that when she saw she was bleeding, she got a paper towel to clean off the blood and that she next went for the phone. Ms. Ray testified that [Appellant] did not come back during that time after Mr. Green had led [Appellant] out.

Ms. Ray testified that she went to the hospital about a quarter to three (3) o'clock the same day. Ms. Ray stated that at the hospital they triaged her, took her in the back, took her vital signs[,] and put her into a room. Ms. Ray testified that her children came at that point and that her oldest daughter stayed with her because she was so shaken up. She testified that doctors came in and checked her head and she informed them of what happened. Ms. Ray testified that when she was at the hospital[,] her right arm was numb and that[,] in fact[,] the numbness had never ceased since then. Ms. Ray testified that she refused to take any sort of narcotic drugs so she was given Ibuprofen 600. Ms. Ray stated that she was at the hospital for about two and half (2 ½) hours and later released at about six (6) o'clock. Ms. Ray testified that she missed nine (9) days of work because of the incident.

Ms. Ray affirmed that she had lasting effects from the incident and that her right arm from her neck down was still numb. Ms. Ray also stated that she was no longer taking Ibuprofen. Ms. Ray testified that she had to go to a "Workman Comp place" for four (4) months of physical therapy. Ms. Ray testified that her physical therapy rehabilitation stopped and that it had been unsuccessful because her arm is still numb.

On cross-examination, Ms. Ray testified that she had been bleeding from her forearm and not her head. Ms. Ray also testified that she did not lose consciousness at any time during the incident nor did she break any bones as a result. Ms. Ray stated that [Appellant] hit her one time with the desk lamp. When [d]efense [c]ounsel questioned Ms. Ray about her screaming when [Appellant] had his hands on her neck, she stated, "I'm not saying I was screaming. That's how I was screaming." Ms. Ray testified that she does not have strength in her arm, but she is able to use it. Ms. Ray affirmed that she never lost the use of her arm.

Ms. Ray affirmed that she knew [Appellant] for about eighteen (18) months and that [Appellant] had not been aggressive towards her prior to this incident. Ms. Ray testified that her only involvement with [Appellant] was to supervise transitional housing as a part of her role as a case manager.

Ms. Ray further testified that she did not get any stitches to her head. Ms. Ray again affirmed that she could remember Mr. Green grabbing [Appellant] after he struck her with the lamp and that [Appellant] did not attack her again thereafter.

On redirect examination, Ms. Ray stated that she had picked up the lamp the night before the incident. She estimated that the desk lamp weighed three (3) pounds. Ms. Ray testified that there had been no other disagreement at all between her and [Appellant] on that day.

TCO at 2-8 (citations to the record, footnote, and heading omitted).

According to Appellant, "[t]o prove an item is a deadly weapon sufficient to justify a conviction for aggravated assault requires that the Commonwealth establish that an otherwise innocuous item was used in such a manner that it is likely or calculated to cause death or serious bodily injury." Appellant's Brief at 8. Appellant emphasizes that "an item having the capability to cause serious bodily injury or death is not enough. It must be likely to do so." *Id.* The crux of Appellant's argument on appeal is that "[t]he Commonwealth never entered any evidence to show exactly how the lamp was used leaving the trial court to speculate about whether the manner of use was likely to cause serious injury, or only capable of causing such injury." *Id.* Specifically, Appellant asserts that "[t]he objective danger of the lamp varies considerably depending upon which end of the lamp [Appellant] swung or pushed at [Ms.] Ray." *Id.* at 16. On the one hand, Appellant argues that "[i]f the lamp has a solid steel base, for example, and it were the end employed in an assault, the Commonwealth's case is proven." *Id.* However, Appellant insists that, "[i]f the lamp end were used … although it could cause a cut or bruise, it is unlikely to cause any real damage." *Id.* Thus, Appellant concludes that, "[w]ithout some evidence to

suggest [Appellant] swung the base of the lamp, the conviction cannot stand." *Id.* at 17. We disagree.

Regardless of which end Appellant used, the desk lamp became a deadly weapon when he intentionally swung it at Ms. Ray's head. Striking a person in the head with either end of a three (3) pound lamp is not only capable of causing death or serious bodily injury, but it is also surely calculated, and likely, to produce such results, especially when considering the testimony that Appellant was over a foot taller and roughly eighty (80) pounds heavier than Ms. Ray. Further, upon learning the extent of Ms. Ray's injuries and the treatment she has consequently required, we agree with the trial that "the extent of Ms. Ray's injuries support the finding that [Appellant] used the desk lamp with such force and intention as to cause serious bodily injury." TCO at 12-13. We also agree with the trial court that the fact that Ms. Ray "would defensively cover her head [with her arm] does not negate that the lamp was used against her as a deadly weapon." *Id.* at 11. We are satisfied that the elements of aggravated assault with a deadly weapon have been met and, accordingly, we conclude that the evidence was sufficient to sustain Appellant's conviction of that offense.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>3/3/2017</u>