J-S38035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THEODORE WAYNE THOMAS | : | |
| | : | |
| Appellant | : | No. 1793 MDA 2019 |

Appeal from the Judgment of Sentence Entered August 26, 2019
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0004556-2018

BEFORE: KUNSELMAN, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED SEPTEMBER 10, 2020**

Appellant, Theodore Wayne Thomas, appeals *pro se* from the judgment of sentence entered in the Court of Common Pleas of Berks County following his conviction at a bench trial on the charges of corrupt organizations, criminal use of communication facility, criminal conspiracy (to commit possession with intent to deliver a controlled substance), possession with intent to deliver a controlled substance ("PWID"), and possession of a controlled substance.[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested and charged with various offenses in connection with a large-scale

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 911(b)(3), 7512(a), 903(a)(1), and 35 P.S. §§ 780-113(a)(30), (a)(16), respectively.

drug trafficking investigation. The Public Defender's Office was appointed to represent Appellant; however, because of a conflict of interest, the Public Defender's Office was permitted to withdraw its representation.

On December 11, 2018, Carmen Stanziola, Esquire, was appointed to represent Appellant; however, on April 3, 2019, Appellant filed a motion alleging various claims of ineffectiveness of counsel. On August 2, 2019, Attorney Stanziola filed a motion seeking to withdraw as counsel.

Thereafter, the trial court granted Attorney Stanziola's motion to withdraw as counsel. Also, following an oral colloquy, as well as a written waiver, Appellant voluntarily waived his right to counsel and elected to proceed *pro se*. *See Commonwealth v. Grazier*, 552 Pa. 9, 713 A.2d 81 (1998). Moreover, following a voluntary waiver of his right to a jury trial, Appellant proceeded to a bench trial on August 26, 2019.

At trial, Pennsylvania State Police Trooper Jay Lownsbery testified that, in January 2017, he was involved in the traffic stop of a target outside of Reading, Pennsylvania, and the police recovered eight ounces of methamphetamine during the stop. N.T. 8/26/19, at 7. The target informed the police that Luis Irizarry was his seller. *Id.*

Thereafter, the target participated in controlled buys of methamphetamine from Mr. Irizarry, and eventually, the target introduced an undercover police officer to Mr. Irizarry, who then sold methamphetamine to the undercover officer. *Id.* at 8.

Upon investigation of Mr. Irizarry's cell phone records, the police discovered phone numbers related to people who lived in Berks County. *Id.* The police secured wiretaps for numerous cell phones, including those owned by Mr. Irizarry and Nelson Rivera, and conducted surveillance. *Id.* at 9-10.

Trooper Lownsbery testified that, as a result of the investigation, the police secured arrest warrants for thirty-nine individuals, including Appellant, as well as search warrants for fifteen separate locations. *Id.* at 11. The warrants were executed on August 2, 2017, with well over one hundred police officers involved; however, some of the individuals, including Appellant, were not arrested on August 2, 2017, since the police could not locate them. *Id.* at 11-12.

Trooper Lownsbery indicated that, in September of 2018, a confidential informant provided the police with Appellant's information, including his new cell phone number. *Id.* Trooper Lownsbery secured a GPS ping order[2] and determined Appellant was located in Shamokin, Pennsylvania. *Id.* at 12. On September 14, 2018, Trooper Lownsbery travelled to Shamokin to set up surveillance; however, pings from Appellant's cell phone revealed Appellant was in Columbia in Lancaster County. *Id.* 12-13. Trooper Lownsbery set up surveillance on the block where Appellant's cell phone was located, and

---

[2] Trooper Lownsbery testified "[t]he ping is basically the cellular company providing [the police] with the GPS location of the phone approximately every 15 to 20 minutes." *Id.* at 13.

Trooper Lownsbery observed Appellant exiting a residence. *Id.* at 13. Appellant was immediately taken into custody. *Id.*

Berks County Detective Michael Rowe testified that, during the summer of 2017, he conducted surveillance in connection with the investigation described by Trooper Lownsbery. *Id.* at 17. Specifically, on July 19, 2017, fellow officers informed Detective Rowe that Appellant was going to meet with Mr. Rivera in the area of 6th and Elm Streets in Reading at 3:07 p.m. *Id.* at 21. The officers received this information from a wiretap on Mr. Rivera's cell phone. *Id.*

Accordingly, Detective Rowe went to the location to conduct surveillance and, at the appointed time, he observed Mr. Rivera sitting on the steps of a residence. *Id.* at 24. Appellant arrived at the scene on a motorcycle, and Detective Rowe observed as Appellant approached Mr. Rivera. *Id.* at 25. The two men spoke with each other, and then Mr. Rivera walked to his vehicle, entered the front driver's side, exited the vehicle, and walked into the breezeway between two houses. *Id.* at 26. When Detective Rowe looked for Appellant, he no longer saw him near the steps of the house, but his motorcycle was still at the scene. *Id.* Detective Rowe believed Appellant entered the breezeway with Mr. Rivera. *Id.*

Mr. Rivera testified he is facing several criminal charges, and he admitted he was testifying against Appellant in the hope that his cooperation would gain him some leniency. *Id.* at 32. Mr. Rivera testified that, during

the summer of 2017, he sold illegal drugs, including methamphetamine, cocaine, marijuana, and heroin. *Id.* He noted he sold only to dealers and not to individual users. *Id.* at 33.

In terms of his operation, Mr. Rivera explained that he waited for dealers to call him, and he would drive to different locations to sell the drugs. *Id.* He testified that on July 19, 2017, Appellant called him to arrange for the purchase of a half-pound of methamphetamine. *Id.* at 35. Mr. Rivera gave Appellant a location and time to meet, and Appellant told him he would be driving a motorcycle. *Id.*

Mr. Rivera testified Appellant arrived at the appointed time and location on July 19, 2017, and after they spoke briefly, Mr. Rivera retrieved the half-pound of methamphetamine from his vehicle, which was parked nearby. *Id.* at 37. He then went into the alley and entered an apartment where Appellant was now waiting. *Id.* Mr. Rivera handed the methamphetamine to Appellant, who in turn gave Mr. Rivera cash. *Id.*

Mr. Rivera testified that Appellant was supposed to pay him $2500.00, but he gave him only $2300.00. *Id.* at 38. Mr. Rivera gave Appellant the methamphetamine with the understanding that Appellant would pay the outstanding balance; however, later that day, in a text message, Appellant reported to Mr. Rivera that the package was "short 2 grams," so the parties agreed Appellant would pay only $175.00 of the remaining balance. *Id.* at

38, 47, 49. Mr. Rivera confirmed he later "linked up" with Appellant, who paid him the outstanding $175.00. *Id.* at 49.

Mr. Rivera testified he had one transactional exchange prior to July 19, 2017, whereby he sold Appellant drugs. *Id.* at 36. He noted that, after his arrest, he listened to the recordings made by the police from the wiretap on his cell phone, and he confirmed the voices for the July 19, 2017, transaction belonged to him and Appellant. *Id.* at 40-41. In the conversation, Appellant asked about the quality of the methamphetamine. *Id.* at 45-46. Further, Appellant encouraged Mr. Rivera to contact another dealer, "Jizz," who might be interested in buying controlled substances from Mr. Rivera as opposed to his regular seller. *Id.* at 43. However, Mr. Rivera informed Appellant he knew "Jizz's" regular seller, and he did not "want to step on the guy's toes." *Id.*

Mr. Rivera identified his and Appellant's voices from a wiretap recording for a different day. *Id.* at 44. Mr. Rivera confirmed Appellant called him to get more product, but Mr. Rivera did not have any, so he told Appellant he would get it to him at a later date. *Id.* at 44-45.

Mr. Rivera testified he possessed three cell phones, and he changed his cell phone numbers every thirty days in an effort to avoid the police. *Id.* at 49. He confirmed that, after he changed his cell phone numbers following the July 19, 2017, transaction, Appellant called him asking for another half-pound of methamphetamine for $2500.00. *Id.* at 51. In a text message, Appellant told him he did not want the methamphetamine to be cut. *Id.* at 52. In

another cell phone call, Appellant told Mr. Rivera he wanted a whole pound of methamphetamine, but he did not have enough money. *Id.* at 53. Mr. Rivera told Appellant the new price was $5,000.00 for a whole pound and $2750.00 for a half-pound of methamphetamine. *Id.* Appellant was not happy with the prices, and no deal was made. *Id.*

Mr. Rivera testified a later wiretap recording captured him calling Appellant to make arrangements to give him a sample of fentanyl, which is "worse than heroin." *Id.* at 55. Mr. Rivera confirmed he exchanged text messages with Appellant, and he "eventually caught up with [Appellant] and gave him a sample." *Id.* at 55-56. Mr. Rivera testified that, in a later cell phone conversation, he advised Appellant he had a fresh supply of methamphetamine. *Id.* at 57.

Mr. Rivera testified David De LaCruz provided him with his methamphetamine, including the methamphetamine he sold to Appellant on July 19, 2017. *Id.* at 60.

Berks County Detective Pasquale Leporace, who was accepted by the trial court as an expert in the field of illegal drug trafficking, testified he was assigned to the instant drug investigation, and he listened to cell phone conversations, which were intercepted via wiretaps. *Id.* at 70. He decoded the conversations and typed out a summary of the conversations for use by the police. *Id.* Detective Leporace testified cell phone communication, which

contained coded language, is the most prevalent manner used for making drug deals. *Id.* at 71.

Detective Leporace testified that in March of 2017 he listened to calls intercepted between Mr. Irizarry and Mr. Rivera. *Id.* at 72. He discovered that Mr. Irizarry, who was trafficking large amounts of methamphetamine, received his supply from Mr. Rivera. *Id.* Accordingly, the police received a warrant to intercept Mr. Rivera's cell phone conversations. *Id.*

Detective Leporace confirmed that, on July 12, 2017, the police intercepted a cell phone call between Mr. Rivera and a certain cell phone number, which the police were aware was used by Appellant. *Id.* at 73. In the conversation, Appellant warned Mr. Rivera that the police were in his immediate vicinity. *Id.*

Detective Leporace also confirmed that, on July 15, 2017, the police intercepted a cell phone call between Mr. Rivera and Appellant. *Id.* at 75. Therein, Appellant asked Mr. Rivera for methamphetamine, as well as recommended that Mr. Rivera supply drugs to "Jizz." *Id.* Detective Leporace testified "Jizz" was the well-known street name for John Ballard, who had been arrested several times in connection with illegal drug activity. *Id.* at 76. Mr. Rivera informed Appellant that he was going to let "Jizz" remain with "Carlito." *Id.* The police were aware that "Carlito" was Carlos Balestier, who bought illegal drugs from Mr. Rivera. *Id.*

Detective Leporace confirmed that, on July 19, 2017, several cell phone calls occurred between Appellant and Mr. Rivera in which Appellant asked to buy methamphetamine, questioned the quality of the product, and made arrangements to meet. *Id.* at 77-80. Further, the police intercepted a text message that day from Appellant to Mr. Rivera wherein Appellant indicated the package of methamphetamine, which Appellant had just purchased, was short two grams, as well as the follow-up cell phone conversation in which the pair negotiated over the reduced price. *Id.* at 81-82.

Detective Leporace confirmed that, on July 23, 2017, Appellant sent two text messages to Mr. Rivera seeking another half-pound of methamphetamine. *Id.* at 84. Also, on that same date, Appellant called Mr. Rivera, and the two men "haggled" over the price of a half-pound of methamphetamine. *Id.* at 89. However, later in the day, Mr. Rivera informed Appellant that he could not get the product. *Id.*

Moreover, on July 23, 2017, the police intercepted a cell phone call between Jizz and Carlito wherein Jizz complained about the quality of 150 grams of cocaine he had purchased from Carlito. *Id.* at 85-86. Carlito, in turn, called Jamal Coleman to discuss whether the cocaine, which Carlito suppled to him, was of good quality.[3] *Id.*

---

[3] As indicated *supra*, Mr. Rivera testified he supplied drugs to Carlito.

Detective Leporace confirmed that, on July 24, 2017, an intercepted cell phone call between Appellant and Mr. Rivera revealed the men made a plan to meet so that Mr. Rivera could give Appellant a sample of fentanyl. *Id.* at 90.

Detective Leporace confirmed that, on July 31, 2017, the police intercepted a cell phone call between Appellant and Mr. Rivera wherein Mr. Rivera informed Appellant he had secured a supply of methamphetamine. *Id.* Detective Leporace indicated this is around the time David De LaCruz, who was Mr. Rivera's supplier, received a shipment of over twenty pounds of methamphetamine. *Id.* at 92. Appellant declined the offer, indicating that he purchased a half-pound from another supplier, but that he would contact Mr. Rivera the next time he needed to purchase methamphetamine. *Id.*

Detective Leporace noted there was "no next time" because, on August 1, 2017, the police arrested David De LaCruz and seized seventeen pounds of methamphetamine from his home. *Id.* at 93.

Detective Leporace opined that the cell phone calls between Mr. Rivera and Appellant demonstrated Appellant was "an active participant being supplied by th[e] drug organization, [and] also increasing the scope of [t]he organization's reach by soliciting the organization to acquire more people to supply." *Id.* at 77. He further opined Appellant was a cog in expanding the scope of the type of drugs trafficked by the organization. *Id.* at 90. He also opined that the cell phone calls between Jizz and Carlito, as well as between

- 10 -

Carlito and Mr. Coleman, demonstrate the scope of the organization. *Id.* at 86.

Appellant testified in his own defense. He testified the police never seized any drugs or cell phones from his home. *Id.* at 107. He also testified the police never observed him sell drugs to anyone. *Id.*

On cross-examination, Appellant admitted he knew Mr. Rivera. *Id.* at 110. However, he denied any of the intercepted cell phone conversations, which were entered into evidence by the Commonwealth, contained his voice. *Id.*

At the conclusion of trial, the trial court convicted Appellant of the offenses indicated *supra*, and on August 26, 2019, the trial court sentenced Appellant to 27 months to 60 months in prison for corrupt organizations, 12 months to 24 months in prison for criminal use of communication facility, 6½ years to 14 years in prison for criminal conspiracy, and 6½ years to 14 years in prison for PWID. The sentences were imposed concurrently to each other. The trial court imposed no further penalty for possession of a controlled substance.[4]

On September 3, 2019, Appellant filed a timely post-sentence motion, and on October 17, 2019, the trial court denied the motion. This timely appeal followed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b)

---

[4] Appellant was provided with his post-sentence and appellate rights.

statement, Appellant timely complied, and the trial court filed a Pa.R.A.P. 1925(a) opinion.

Preliminarily, we note Appellant's *pro se* brief does not comport with the Rules of Appellate Procedure.  For instance, Appellant's brief does not contain a Statement of Jurisdiction, a Statement of Questions Involved, a Statement of the Case, or a Summary of Argument.  ***See*** Pa.R.A.P. 2114, 2116, 2117, 2118.

Nevertheless, we discern that Appellant is challenging the sufficiency of the evidence supporting his convictions for PWID and corrupt organizations, and he contends the trial court's verdict is against the weight of the evidence.

With regard to Appellant's sufficiency of the evidence claims, we note:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa.Super. 2014) (quotation and citation omitted).

Appellant first suggests the evidence was insufficient to sustain his conviction for PWID since there is no evidence the police observed him in possession of a controlled substance.

Initially, we agree with Appellant that possession is an element of his conviction for PWID.[5] To establish the element of possession, this Court has held that "[p]ossession can be found by proving actual possession, constructive possession,[6] or joint constructive possession." *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa.Super. 2018) (citation omitted) (footnote added). Possession may be proven through circumstantial evidence. *Commonwealth v. Baldwin*, 604 Pa. 34, 985 A.2d 830 (2009). Further, the testimony of a prosecution witness may be sufficient to establish

---

[5] 35 P.S. § 780-113(a)(30) provides the following is prohibited:
(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.
35 P.S. § 780-113(a)(30).

[6] Constructive possession requires proof of the ability to exercise conscious dominion over the substance, the power to control the contraband, and the intent to exercise such control. *Commonwealth v. Petteway*, 847 A.2d 713, 716 (Pa.Super. 2004). Constructive possession may be established by the totality of the circumstances. *Commonwealth v. Parker*, 847 A.2d 745, 750 (Pa.Super. 2004).

possession if the trier of fact chooses to lend credibility to the testimony. *See Commonwealth v. Robinson*, 817 A.2d 1153 (Pa.Super. 2003) (holding eyewitness testimony sufficient to sustain firearm possessory violations even though no weapon was recovered by the police).

In the case *sub judice*, Detective Leporace confirmed that, on July 19, 2017, he listened to intercepted cell phone calls wherein Appellant sought to purchase methamphetamine from Mr. Rivera, and the two men made a plan to meet. Mr. Rivera's testimony confirmed these cell phone calls occurred between him and Appellant on July 19, 2017.

Mr. Rivera testified Appellant arrived at the appointed time and location on July 19, 2017. Detective Rowe, who was conducting surveillance, confirmed he observed Appellant arrive at the appointed location and time on July 19, 2017, he saw Appellant conversing with Mr. Rivera, and he saw Mr. Rivera retrieve an item from his nearby vehicle. Detective Rowe admitted that, although he saw Mr. Rivera enter a breezeway between two houses, he lost sight of Appellant, whose motorcycle remained at the scene.

However, Mr. Rivera confirmed that, prior to entering the breezeway, he had retrieved methamphetamine from his vehicle, and after entering the breezeway, he entered an apartment where Appellant was waiting for him. Mr. Rivera specifically testified he handed the methamphetamine to Appellant, who later in the day texted Mr. Rivera to complain that the package of methamphetamine was light by two grams.

Based on the aforementioned, viewing the evidence in the most favorable to the Commonwealth as verdict winner, we conclude the Commonwealth sufficiently established Appellant was in possession of the methamphetamine on July 19, 2017. **See Antidormi**, **supra**. Accordingly, there is no merit to this claim.

Appellant next challenges the sufficiency of the evidence supporting his conviction for corrupt organizations. Specifically, he argues there is no evidence that he was employed by or associated with any enterprise involving racketeering activity.

Section 911 of the Crimes Code, relating to corrupt organizations, provides in relevant part that "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 Pa.C.S.A. § 911(b)(3). "Racketeering activing" includes PWID. 18 Pa.C.S.A. § 911(h)(ii) (footnote omitted). An "enterprise" is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S.A. § 911(h)(3).

Here, viewing the evidence in the light most favorable to the Commonwealth, as the verdict winner, we find no merit to Appellant's claim that there is insufficient evidence to establish he was employed by or

associated with an enterprise involving racketeering activity. Detective Leporace testified about the criminal investigation in this matter wherein the police intercepted cell phone calls and text messages between various individuals involved in the trafficking of illegal drugs. Specifically, he testified that, after listening to various intercepted cell phone calls, he determined that David De LaCruz was a major supplier of methamphetamine to Mr. Rivera, who supplied the drug to dealers, including Appellant. Mr. Rivera confirmed Detective Leporace's testimony regarding the structure of the drug dealing operation. Further, Detective Leporace testified the intercepted cell phone calls revealed Appellant attempted to expand the illegal business when he recommended that Mr. Rivera sell to Jizz, who was known to the police as a drug dealer.

Based on the aforementioned, the trier of fact was free to conclude that Appellant was employed by or associated with an enterprise devoted to illegal drug dealing and he participated in the enterprise's affairs through a pattern of PWID. Accordingly, we conclude the evidence was sufficient to sustain Appellant's conviction for corrupt organizations. ***See Commonwealth v. Dellisanti***, 583 Pa. 106, 876 A.2d 366 (2005) (holding evidence sufficient to sustain conviction for corrupt organizations where the defendant sold drug paraphernalia from her retail store); ***Commonwealth v. McCurdy***, 943 A.2d 299 (Pa.Super. 2008) (holding evidence sufficient to sustain conviction for corrupt organizations where the defendant, a drug dealer, was involved with

four other drug dealers, all of whom sold crack cocaine at the same house, referred customers to each other, and collected payment for each other).

Appellant also suggests the trial court's verdicts were against the weight of the evidence since Mr. Rivera was an untrustworthy witness with an incentive to lie.[7]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict

---

[7] Appellant adequately preserved his weight of the evidence claim in the lower court. *See* Pa.R.Crim.P. 607.

is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, the trial court rejected Appellant's weight of the evidence claim, and we find no abuse of discretion in this regard. *Talbert*, *supra*. We note the finder of fact was free to determine the weight and inferences to be drawn from Mr. Rivera's pending criminal charges, as well as his desire to receive leniency in exchange for his testimony against Appellant. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact").[8]

---

[8] We note that, in a one paragraph argument, Appellant asserts his sentence is improper under *Alleyne v. United States*, 570 U.S. 99 (2013), since the trial court used an elevated offense gravity score based upon the weight of the methamphetamine without first requiring a jury to make a factual finding regarding the weight. We dispose of this claim simply by noting that the offense gravity score is a factor used by the trial court in determining the recommended range of sentences provided for under the Sentencing

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/10/2020

---

Guidelines. *See Commonwealth v. Yuhasz*, 592 Pa. 120, 923 A.2d 1111 (2007). With regard to the prohibition set forth in *Alleyne*, our Supreme Court has stated that "[t]he effect of *Alleyne*'s new rule was to invalidate a range of Pennsylvania sentencing statutes predicating **mandatory minimum penalties** upon non-elemental facts and requiring such facts to be determined by a preponderance of the evidence at sentencing." *Commonwealth v. Wolfe*, 636 Pa. 37, 140 A.3d 651, 653 (2016) (emphasis added). Here, mandatory minimum sentences were not at issue. Instead, the offense gravity score was an enhancement to the sentencing guidelines, and, thus, *Alleyne* is not implicated. *See Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1270 n.10 (Pa.Super. 2014) (*en banc*).